ZEPHA I. GIFFIN, DEFENDANT IN ERROR, v. FRANK PETREE, TRUSTEE, ETC., PLAINTIFF IN ERROR.—46 S. W. (2d) 609.

Kansas City Court of Appeals.  January 11, 1932.

*R. B. Bridgeman* and *A. M. Tibbels* for plaintiff in error.

*Horace Merritt* for defendant in error.

TRIMBLE, P. J.—This is an action seeking compensatory and punitive damages for an alleged conversion of personal property by defendant Frank Petree, trustee in bankruptcy of John F. Iden, a bankrupt. The jury returned a verdict of $2000 compensatory, and $1500 punitive damages. Whereupon defendant sued out, in this court, a writ of error.

At the outset there seems to have been at least two other defendants, but plaintiff dismissed as to one and the other was let out in some unknown way, for Petree is the only defendant who now answers, and the only one against whom the verdict is returned. For convenience, we designate the parties "plaintiff" and "defendant" as they were at the trial in the Circuit Court.

To properly understand the circumstances of the alleged conversion, it is necessary to set out, as the background of the picture presented by the taking of the property, the following facts:

John F. Iden is the father of the plaintiff, and for many years prior to his bankruptcy, and before the institution of this suit, owned two tracts of land on the shores of "Big Lake" in Holt county, Missouri, and on one of these he maintained a summer resort consisting of a large frame dwelling, used and known as a hotel, and a number of cottages. The hotel was equipped with furniture and other articles needed in the operation thereof, and the cottages were furnished so as to enable "resorters" to rent them for the summer season and do light housekeeping. Mr. Iden also operated, in connection with the hotel, a small general store stocked with groceries and other articles. He finally became heavily in debt.

On December 15, 1921, he conveyed to his daughter (this plaintiff) the tract containing the hotel and resort and at the same time he also turned over or conveyed to her the furniture and other property contained in the hotel and cottages and all property owned and used by him in the operation of said hotel and resort.

On July 3, 1922, Mr. Iden conveyed the other tract of land above mentioned to his said daughter, the plaintiff. The conveyance of this property was also without consideration. The lands were heavily incumbered, but the personal property was free.

On October 8, 1923, Iden filed a voluntary petition in bankruptcy in which he listed secured debts to the amount of $57,000 and unsecured debts amounting to about $30,000. The assets, over and above incumbrances, were listed as amounting to $3,900.

Defendant, Petree, was duly appointed trustee in bankruptcy of the bankrupt estate of John F. Iden, and suits were instituted to set

aside the deeds from Iden to plaintiff, and during the somewhat extended period of this litigation, Mr. Iden *continued in the possession of the property* which he had turned over or conveyed to his daughter. At length, a decree was obtained from the United States District Court setting aside the deeds as being without consideration, fraudulent and void as to creditors.

The trustee obtained the proper order from said court directing the bankrupt, Iden, to surrender possession of the real estate to him. But Iden *refused to obey* until after the court had adjudged him guilty of contempt in not obeying, and, under said contempt adjudication, Iden had been taken into custody by the United States marshal.

At the time Iden was ordered to deliver possession of the real estate to defendant trustee, the referee in bankruptcy also made an order requiring Iden to turn over to said defendant trustee the personal property he had theretofore given or transferred to his daughter.

The ''turn-over'' order was made on May 24, 1926.

On June 9, 1926, Iden, the bankrupt, filed a ''Petition for Review of Referee's Order to Turn Over Personalty.'' This petition the referee denied on the 14th day of June, 1926, as having ''no merit,'' and also because it was filed more than ten days after the ''turn-over'' order was made, and no extension of time for filing said petition for review had been granted.

On the same day the bankrupt's petition for review was filed, to-wit, June 9, 1926, the plaintiff filed her ''Application in the nature of an Interplea,'' praying the referee to set aside said ''turn-over'' order and ''to compel the trustee to obtain possession of said property from petitioner by due process of law,'' etc.

On the 15th of June, 1926, the plaintiff's petition to set aside the ''turn-over order'' was denied by the referee without a hearing thereon. And on the 30th of June, 1926, the petition of the bankrupt ''to certify to the judge the exceptions of the bankrupt to the order of the referee denying review of turn-over order for personal property heretofore made'' was denied.

The ''turn-over order'' was delivered to defendant, and on July 24, 1926, being the same day that Iden, the bankrupt, in the custody of the United States marshal, delivered possession of the real estate to the defendant trustee, the latter also took possession of the personal property involved herein, under said ''turn-over'' order. At the time of such taking, said defendant trustee made an inventory and listed the same and took possession of it as the property of the bankrupt estate of John F. Iden.

Thereafter, on some date not shown in the record, but presumably about the 22nd of September, 1927, plaintiff brought this action in the state court against the defendant as trustee in bankruptcy of

the bankrupt estate of John F. Iden, to recover, as damages, the value of the personal property charged to have been converted by the trustee, together with punitive damages for the alleged "unlawful, wrongful and malicious" taking of the same. As will more fully appear later herein, the petition seeks to recover the value of the *whole* property taken possession of by the trustee, but the plaintiff's evidence tends to show that this includes not only property conveyed or given to her by her father, the bankrupt, but also some property not listed or taken by defendant as well as some articles which she claims to have owned *prior* to the conveyance to her by her father and some that she claimed to have acquired *after* the adjudication of her father's bankruptcy.

It is conceded and indeed it was *adjudicated* by the United States Court that the conveyances of the real estate made by Mr. Iden to his daughter were voluntary and without consideration; and Mr. Iden, who was plaintiff's witness, testified that he turned the personal property and business over to plaintiff in December, 1921; that the hotel and cottages were fully equipped at that time and that his conveyance of the personal property to his daughter was voluntary and wholly without consideration, or, as he says, when asked that question, "I gave it to her."

In her petition, plaintiff stated the value of *all* the property sued for, i. e., the property which Mr. Iden conveyed or turned over and gave to his daughter and that which she claimed to have owned individually prior to the bankruptcy and that which she claims to have acquired after the bankruptcy, to be $3500; and in her deposition (taken in Wyoming where she lived at least all the time from and after the year 1924, and in which deposition she stated that, after her marriage in 1920, she lived at "Big Lake" "just during the summer time" of the years 1921, 1922, 1923 and 1924), she testified that the fair value of all the property was $3500. She also stated in said deposition that during the summers mentioned, her father was in charge of the property as her agent; that she personally conducted "this business" during these years of 1920, 1921, 1922, 1923 and 1924, and when she left Missouri, she left the property she claimed belonged to her, "right at the hotel there" and in the charge of her father as her agent.

She also testified in her deposition that she acquired "some of this property," prior to her marriage, from her mother; that she acquired the balance of it "thru my conduct of the business;" that she got some of the property, other than the above, in another way— "My father, probably while he ran the business as my agent, acquired some small amount of it." When asked, "Did some of this property belong to anyone other than you?" she answered, "Some of it belonged to my mother."

722

Her mother also testified, as a witness for plaintiff, that she owned a part of the property, and that its reasonable value would be about $1000. But she mentioned it in a very general way and did not enumerate definitely any more than a bedroom suite, two feather beds, and "well, a few other things, I think some silverware I had and some dishes and I had quite a few presents that had been given to me and pillows;" that Mr. Iden paid "for part of it, I presume." "I don't know whether he helped pay for the bedroom suite or not that I had, but I presume he did." She also said she owned "some spoons that was given to me from different ones." She testified that the bedroom suite cost her "about $50;" that the silverware was worth $8 or $10; that her two beds were worth $25 apiece and the two pillows about $5 apiece, in the aggregate about $120; but there was no more definite enumeration than the above and no *enumeration or valuation* of any other property to make up the remainder of the $1000 valuation placed by her on the property she claimed to own. She testified that the property she claimed to own was, at the time, contained in the hotel building and where she and her husband were living.

We have searched the record carefully and are unable to find any valuation of the property by plaintiff *except as a whole,* that is, $3500 for the whole property charged to have been converted, and no valuation of the property given to her by her father separate from that she claims to have obtained otherwise.

Plaintiff offered in evidence (Exhibit 16) made up from an inventory or list of the property taken by the trustee, or "turned over to Frank Petree, trustee in bankruptcy . . . by order of United States Marshal L. C. Wilson, about 4 o'clock P. M., July 24, 1926. Earl Gresham was placed in charge by Frank Petree, trustee in bankruptcy." This list or inventory was made by John F. Iden two or three days after the property was taken, and he testified that he made it "just from memory" and the total of the itemized valuation he seems to have placed thereon, though he nowhere testifies that such valuations are correct, amounted to $4589.15. He, Mr. Iden, does say he and his wife "made it up together; that is, just taking as we could get on the list, and appraising it as best we could, considering about what had been paid for it." A list of property made by Iden as property *not taken* by the trustee (Exhibit 17) was introduced in evidence by plaintiff, with itemized valuation aggregating $1335. However, Iden testified he "didn't know for sure whether" a part of the property listed on Exhibit 17 is also listed on Exhibit 16. "I don't remember but I don't think it is." He was asked if the articles listed in Exhibit 17 are articles that are not included in Exhibit 16, and he answered, "Well, they are supposed not to be; the jewelry and everything in there I know is not, because

there is not any of it on there." The "jewelry and everything in there" had an itemized valuation of $185. Elsewhere in the record Iden testified that Exhibit 16 was a list of the property that *was taken by defendant* and which *was not in the inventory* (i. e., the list made by defendant); but on cross-examination he said, "I don't know who took the property." We mention these matters to show the unsatisfactory condition of the evidence in plaintiff's behalf as to the property and its value. (Indeed, there is an utter lack of *definite* evidence as to value or certainty concerning the pieces of property taken.) Certainly the jury had no definite way of determining just what property was taken, nor the articles, nor the value of the property taken, which plaintiff *got from her father,* nor the amount nor value of the property she claims she *obtained elsewhere,* and which she charges was also taken.

The unsatisfactory state of the evidence as to what property was taken might perhaps be disregarded, were there no evidence of diverse ownership as to different portions thereof, in view of the general nature of defendant's admission in his answer that the said John F. Iden, bankrupt, in compliance with said turn-over order, "delivered to this defendant as trustee in said bankrupt estate *the prope:ty mentioned in plaintiff's petition,* excepting the jewelry therein described, and that this defendant has ever since said date held and is now holding and claiming said property as belonging to the bankrupt estate of said John F. Iden and as subject to disposition under the Bankrupt Act and under the orders of the United States District Court." But even if this answer does admit that the "property mentioned and described in plaintiff's petition" was received by him, there is no admission as to the *value* of the property *owned by plaintiff* and taken, nor as to the particular pieces, amount or value of property owned by her mother. So that we do not see what basis the jury had for determining plaintiff's compensatory damages for *her* property taken. Consequently, for this, if for no other reason, the case should be, at least, reversed and remanded. It cannot be successfully maintained that no such question as to the lack of evidence as to value was raised in the trial court because such was raised by the 13th point in the motion for new trial that there was no evidence to authorize the verdict rendered.

The first point made by defendant is that the court erred in giving instruction No. 1, in that it authorized punitive damages. Said instruction concludes as follows:

"and if you further find and believe from the evidence that said taking and converting of said goods if you find they were so taken and converted by the defendant, was malicious as defined to you in other instructions, then you may allow to the plaintiff in addition to her actual damages, if any, such sum as exemplary or punitive dam-

ages as you may believe from the circumstances and facts detailed in evidence would serve as a proper punishment to the defendants not to exceed the sum of twenty-five hundred dollars, the sum sued for as exemplary damages.''

Instruction No. 2 is as follows:

''The court instructs the jury that by the terms 'malice' or 'maliciously' as used in these instructions is not meant mere spite or ill will but intentional doing of a wrongful act without just cause or excuse.''

The question raised by the point made is, does the record authorize or justify any submission of punitive damages? ''Not every legal wrong entitled the injured party to recover exemplary damages. To warrant the allowance of such damages the act complained of must not only be unlawful, but it must also partake somewhat of a criminal or wanton nature. And so it is an almost universally recognized rule that such damages may be recovered in cases, and in only such cases, where the wrongful act complained of is characterized by some such circumstances of aggravation as wilfulness, wantonness, malice, oppression, brutality, insult, recklessness, gross negligence, or gross fraud on the part of the defendant.'' . . . ''So on the other hand, although there be neither malice nor fraud, nor intent to oppress on the part of the wrongdoer, yet if the act be done in a rude, insulting, or reckless manner, in disregard of social obligations, or with such gross negligence as to amount to positive misconduct, there would be ground for exemplary damages.'' [8 R. C. L., sec. 132, pp. 585-6, 588.]

''As a general rule to warrant the allowance of exemplary damages there must be some evidence of malice, express or implied, or oppression; but positive proof of malice or oppression is not required. It is sufficient if, from the transaction or the facts shown in connection therewith, either of these may be fairly implied.'' [8 R. C. L., sec. 134, p. 590.] ''For an analogous reason exemplary damages can never be allowed against the innocent,'' . . . ''It is therefore apparent that the intention and the motives with which the act was done are always material, and should be inquired into. It follows, further, that exemplary damages are not authorized where a tort is committed unintentionally,'' . . . ''And so one is not liable for exemplary damages if he acts in good faith under an erroneous sense of duty or right, without any intention to oppress or defraud, or without any actual oppression or indignity. Nor can exemplary damages be recovered where there is a reasonable excuse for the defendant, arising from the provocation or fault of the plaintiff, but not sufficient entirely to justify the act done.'' [8 R. C. L., sec. 135, pp. 591-2.] . . . ''where more than one person is sued, the malice of one defendant cannot be imputed to another without connecting proof.'' [8 R. C. L., sec. 140, p. 596.] ''If an officer, in the

execution of a writ of replevin, injure the property of a stranger, but without wilfulness or malice, he will be liable for actual damages only. Public officers acting within the scope of their authority, are not answerable in damages for their acts unless done maliciously."
. . . In all cases where there is neither fraud, malice, gross negligence nor oppression in the act complained of, *compensation* commensurate with the injury, is what the complaining party is entitled to. (Italics mine.) [Bruce v. Ulery, 79 Mo. 322, 327.] "Punitive damages cannot be recovered unless it appears the act complained of was unlawful and was also wanton or malicious." [State v. Jungling, 116 Mo. 162.]

Now what is the situation here? The defendant was the duly appointed and qualified trustee in bankruptcy, an officer of the court. He had been *ordered* to take possession of the personalty, and the turn-over order delivered to him by the bankruptcy authorities specifically refers to the property as being at the resort and in the hotel, store, etc., above referred to. He was dealing with Iden who had been *adjudged* to have *fraudulently conveyed* his real property, who had *refused* to obey the order of court to turn over the possession of the property fraudulently conveyed, who had been ordered committed for contempt in so doing, and who was at that very time in custody of the United States marshal. The property the trustee was ordered to take is in the possession of the recalcitrant bankrupt and it precisely conforms to the kind of property and the place where located as set forth in the turn-over order. No one else is in possession. The plaintiff, who claims that it was hers, was not there. She was in Wyoming. She admits in this case that the property was in possession of Iden, but says it was in his possession *as her agent*. But there is not a single fact or circumstance to show this except here mere *ipse dixit* and that of Iden's. So far as everything else was concerned, it was in his possession; and the far greater portion of it was admittedly *his* though he says he had given it to plaintiff. So that there is nothing to warrant the infliction of punitive damages for the *mere* taking of the property, but only in case defendant was guilty of wantonness, oppression, insult, etc., in the *manner* of taking the property or while doing so.

On this feature of the matter, the record shows that defendant went to Iden's hotel several times before the day on which he took possession of the property. Mrs. Iden, plaintiff's mother, testified that on one occasion he came to the home to make an inventory of the property but witness would not let him in, saying, "Mr. Petree, what is in this house is my daughter's and mine. You cannot come in." Defendant did not attempt to enter but went away. A few weeks thereafter he came back and said he "wanted to take that stuff," and I said, "You can't take it, Mr. Petree, because this belongs

to my daughter and me; it don't belong to Mr. Iden.'' She says that he replied, ''I am going to tell you what you are going to get, you and Mr. Iden are going to get throwed in jail.'' . . . ''I said, 'What is here belongs to Mrs. Giffin and me.' 'Well,' he says, 'You will both get throwed in jail,' so then he went away. He did not take it that day.''

The record shows that Mrs. Iden was asked what was said to her on the day the property was taken, and she replied, ''Well, he said I had to give possession of the personal property and I didn't—and then, finally, why *they* said I could either give possession or consider myself under arrest, *they* would take me and throw me in jail. Well, then, when Mr. Wilson (the United States marshal) was there, he said I had to give possession, and I thought I did and so I left—I give possession, and then they took over the stuff. Well, when they went—I saw they was not taking one of all of it in the kitchen, they were just taking one article after another and I said to *Mr. Bridgman* (not the attorney R. B. Bridgman), I said, 'You are not taking near all of this stuff' and *he* says, 'Well, we are going to take all of your good stuff, and the rest we will let go to hell.' And Mr. Petree said 'that is what we will do.' Then when they went back into the supply room, taking a list back, that is— . . . they were not taking a list of all of the stuff there and I even called their attention to it again, and *Boze Bridgman* said to me, 'We don't intend to let you have some of this stuff,' but *Bob Minton* (who was plaintiff's attorney in seeking to regain the property) just walked around, and just when he sat down, now, he says, 'We will just make a jackpot of it all, throw it all in for one good suit,' that is what Mr. Boze Bridgman said.'' ''Q. Was Petree present? A. He was standing there, but *if he said anything,* I don't remember.''

She was then asked, ''Go ahead and tell what else took place, what you heard? A. So he told me then, to take what—if *they* told me once, they told me a dozen times, to be still or *they* would have me arrested or put me in jail. *They* didn't use any courtesy. *They* just talked something terrible to me. So Mr. Petree told me to hurry up and get out of there and *take what I wanted* and he would be back in a week and let me have the rest of my clothes. Well, I went—''

Witness further testified that *afterward* when he (the trustee) came back the following took place:

''When we went upstairs to get my things, the room was something terrible; it was awful; there was beer bottles and pint bottles and pop bottles in there. Why, the room it looked something terrible and I said, 'Well, there has been somebody in here,' and Petree said, 'I don't want a word out of you, don't say a word, and get what you have got and get out of here. We have been working *three years to get you out.*' Now, he says, 'You get out and git or I will arrest

you and throw you in jail.' I says, 'What have I done?' And so he stood there and he said there hadn't been anybody in the room. 'Well,' I said, 'Here is a basin of dirty water, somebody has been in here and washed.' And I showed it to him and he said he couldn't help that, he would not be accountable for it, then I got my things out of that room.'' She testified that then they went into Zepha's (plaintiff's) room; that ''I began to cry, and felt bad about it, and Boze Bridgman said—Mr. Petree said, 'We don't want any of that, hush up, hush up, or get out.' That is the way they would talk to me, and Boze Bridgman said, 'Throw her down stairs!' and he reached around to take hold of me, and then one of the men was there to help me—I don't know whether he saw it or not, and I said, 'Don't you touch me,' and Mr. Petree was on one side of me and Bridgman was on the other, and that was upstairs and then when I went downstairs—''

She further testified that about *three weeks after* the personalty was taken charge of, ''there was a pair of overalls hanging on the side of the wall and Mr. Boze Bridgeman picked up those overalls and he said. 'Here take these, can you wear them?' And I said, 'No, I can't wear them, but poverty might drive my husband to them.' And I did take those overalls and I still have them at home, but he just took one leg in one hand and the other in the other and stretched them out like this when he asked me if I could wear them and I said no.''

The foregoing is all that appears in the record which can be said to bear upon the alleged element of insult, oppression or indignity necessary to the allowance of an award for punitive damages. The defendant and all the men deny that any of the language charged was used. But, of course, in view of the verdict, we must accept her testimony as true. It will be observed, however, that there is very little charged to have been said by defendant Petree, but some unpleasant words by the other men there; and, in one place, the witness says Mr. Petree did not say anything on that particular occasion. Again, it is not seen how anything said *prior* to or *after* the day of the alleged conversion can be relied upon to create the element or elements necessary to create a ground for punitive damages. On the occasion when Petree went to witness's home *prior* to the day of the alleged conversion, she says she told him he could not come in, and that he told her she and her husband would both ''get throwed in jail.'' If he said this, it was no part of the trustee's conduct on the day when he took possession of the property. Besides, under the circumstances, it constituted no threat, insult or element of wantonness or oppression. It was the *prophetic statement* of what would happen if she persisted in her refusal to let him take possession of the property, and what *did actually happen* to her husband on ac-

count of his refusal. It was more in the nature of a warning, and a very pertinent and timely warning, of what would very likely be the consequences of her conduct. The evidence does not show in what manner this was said, and there was nothing to cause Mrs. Iden to be frightened or disturbed, because she continued to refuse to let the trustee make a list.

On the day he took possession of the property she evidently raised the same objections as before and Petree said I had to "give possession of the personal property." What else could he say? He was there under an order of the bankrupt court charged with the duty of taking the very property he did take. There surely was no element of wantonness, oppression or insult in this.

It is manifest from the evidence of this witness herself that she was around, and in the way, and continually annoying (perhaps not intentionally) the officers or the defendant in the attempt to do his duty as directed by the turn-over order. Moreover, the *defendant* does not seem to have said the other things charged. They were said by Bridgman and the others there. The evidence does not disclose in what capacity they were there, whether as agents for Petree, or interested as officers, or as the representatives of some of the bankrupt creditors. Surely what others, not connected with Petree, may have said could not, and should not, be imputed to him unless he endorsed or approved of it in some way, and this the evidence does not show. Besides, the two men who seemed to have uttered the offensive words are the very men who have been *dismissed and discharged* from this suit. Moreover, even if it be true that defendant did not exhibit at all times the Chesterfieldian manners that plaintiff's mother seems to think he should have shown, still this does not warrant the allowance of punitive damages "when there is a *reasonable excuse* for the defendant arising from the provocation or fault of the plaintiff (here Mrs. Iden), but not sufficient entirely to justify the act done." [8 R. C. L., sec. 135, p. 591.] (Italics mine.) It should be remembered, also, that it was not the *plaintiff* to whom the so-called oppressive acts or insulting words claimed to justify punitive damages were addressed, but to *Mrs. Iden. She* was not in possession of the property as plaintiff's agent, and yet she was the one who obstructed the trustee in the performance of his duty or gave him any provocation or trouble of any kind. Nevertheless, if punitive damages are to be allowed, it will be the plaintiff, and not Mrs. Iden, who will collect and receive them. Doubtless, this should have little or no weight if Mrs. Iden was in charge of the property as plaintiff's agent, but under the peculiar circumstances of this case, it is not without its bearing.

It is true, the defendant trustee did not take the turn-over order with him at the time he took possession of the property, but everyone

connected with the matter knew he was acting under that order and as trustee. Not only the bankrupt, but the plaintiff herself, had sought to have the turn-over order set aside, and Mrs. Iden, in refusing to allow the trustee to enter the hotel, shows by her own testimony that she knew the ground on which, or the power under which, the trustee was proceeding. The fact that the trustee did not actually have the turn-over order with him at the time of taking possession of the property does not prevent his act from being done *under* said order. It seems to be clear that, whatever else may be said as to plaintiff's right to recover in this case, she is not entitled to punitive damages.

Complaint is made of plaintiff's instruction No. 3. It reads as follows:

"The court instructs the jury that if they find and believe from the evidence and under the other instructions in this cause that the plaintiff's goods and chattels mentioned in evidence were taken wrongfully and illegally from the possession of the plaintiff or her agents or employees and that she was thereby actually damaged, *then the law allows what is called exemplary or punitive damages* in addition to the actual damages, if the jury find and believe from the circumstances detailed in evidence that such taking and converting was malicious, or accompanied with circumstances of wantonness, malice, or oppression, and malice may be either malice in fact or malice in law, the former malice in fact in common acceptation means ill will against a person and the act done intentionally and without justification, and malice in law may be inferred if the evidence shows that the act of conversion was intentionally done, wrongful and without justification even though there was actually no ill will against the plaintiff by the defendant." (Italics mine.)

In the first place, if there are no punitive damages allowable in the case as thus presented, then the instruction should not have been given at all. In the next place, one instruction on punitive damages had already been given and to give another instruction thereon tended to emphasize that feature of the case. If punitive damages are allowable in a case, only one complete instruction on that subject need be given, at least only one on a side. To give more than one on a side is unnecessary and likely to be harmful. Furthermore, the italicized portion of said instruction reveals clearly that the court told the jury that if they found plaintiff's goods were taken and that she was damaged, "then the law allows" punitive damages, etc. This statement, *without further explanation*, would be understood by the jury as meaning that if they found certain facts and that plaintiff was actually damaged, then the *law awarded* punitive damages. In other words, they *must follow the law* and award punitive damages if they

found actual damages. This is not correct. The allowance of punitive damages is *wholly discretionary* with the jury. [Carson v. Smith, 133 Mo. 606, 617.]

Error is also complained of in plaintiff's instruction No. 5. It reads as follows:

"The court instructs the jury that in order to constitute the act of conversion of property of another to his own use, it is not necessary to prove that the party charged with the conversion sold or disposed of the property to his own advantage, but proof of the taking it out of the possession of the owner or party entitled to the possession thereof and withholding it from him constitutes a conversion of the property, and the jury are therefore instructed that if you find and believe from the evidence that the defendant took the property in controversy out of the possession of the plaintiff or her agents or servants in charge thereof and withholds same from her then your verdict should be for plaintiff notwithstanding you may further find from the evidence that the defendant may still have in his possession and control the said property."

This instruction attempts to define, or to tell the jury what acts would constitute conversion, but omits entirely to require the jury to find that either the taking or withholding was wrongful. As there was no controversy over the fact that defendant took and withheld the goods, this instruction was, in effect, a peremptory instruction to find for plaintiff. The objection is met by plaintiff with the assertion that the omission was harmless because the other instructions contained the missing element of illegality and wrongfulness. This cannot be true for more than one reason. *First*, the instruction *directs a verdict* for plaintiff, and no one can tell which instruction the jury followed. *Second*, all the other instructions (with the possible exception of one), containing the missing element of wrongfulness, dealt also with the awarding of punitive damages, and the jury may well have thought that the wrongfulness was necessary only in that connection. This instruction seems also to impliedly assume that the property in controversy belonged to plaintiff, and, if it does, this is error.

It is urged that defendant's demurrer to the evidence at the close of the whole case should have been sustained, since there was no evidence from which the jury could determine what particular articles of property were in fact owned by plaintiff, or the value thereof, separate and apart from that owned by her mother, or *in fact* owned by her father but fraudulently conveyed or turned over by him to her. However, if she was the *bona-fide* owner of any of the property taken possession of by the trustee, then doubtless the demurrer was properly overruled, since, in that case, she was entitled to at least nominal damages. [38 Cyc. 2088.] But manifestly, in this case,

plaintiff's evidence, both as to *title* and *value,* as well as to the *specific articles* owned by plaintiff, and claimed to have been converted by defendant, must be *definite,* and not a mere *blanket claim* and assertion of value of the property as a whole, before the jury can render a verdict as to the articles in fact owned by her and their value, else the verdict would be mere guesswork. Both title and value should be definitely shown in cases seeking damages for conversion. [N. K. Fairbanks Co. v. Illinois Central R. Co., 167 Mo. App. 286; Wood v. Great American Ins. Co., 279 S. W. 205; Buschow Lumber Co. v. Hines, 206 Mo. App. 681.] The jury had no evidence from which they could find the value of the property that was *in fact hers,* nor does the verdict specify what property she was entitled to recover possession of, but applies to *all* the property in controversy, for the verdict merely reads, ''We, the jury in the above entitled cause, find the issues in favor of the plaintiff against the defendant and assess her actual damages,'' etc.

In view of the hereinabove mentioned point in the motion for new trial, it will not do to say that this feature was not raised in the trial court.

Nor can it be rightfully said that the case was tried on the theory that the question of fraudulent conveyance of the personal property to plaintiff by her father was for the jury. The defendant drew out of plaintiff's witnesses the evidence showing that it was without consideration, and void as to the bankrupt's creditors. The defendant sought in various ways to obviate the return of any verdict for damages against defendant. And, as stated, the evidence was not such as authorized any judgment for damages unless perhaps nominal damages, but the court's rulings were against defendant. When thus driven by the court into this position, defendant had the right to fight the case on any ground left available to him by the court, and when he did so, he is not open to the charge that by instructions subsequently asked he is conclusively held to have submitted his case on the plaintiff's theory and is bound by the verdict rendered. A defendant is in a vastly different situation or attitude from that of a plaintiff. As said by the Supreme Court in Everhart v. Bryson, 244 Mo. 507, l. c. 517:

''The plaintiff brings the action. If the ruling is adverse, he may take a nonsuit. Not so with the defendant. He is in court without his consent. The court may make any number of rulings that he may deem erroneous, but he cannot abandon the case; he is in court, and must remain until the cause is finished. He has a right to tender as many defenses as he has. If the court erroneously deny him one, he must avail himself as best he can of those remaining.''

The far greater portion of the property was that used in connection with the hotel and resort and store business of the father, and which

concededly was turned over to his daughter (the plaintiff), by him in fraud of his creditors, and, as heretofore shown, was actually in his possession, though he and she both *say* (without any proof except their bare word) that it was in his possession as her agent. The burden was on her to show that she was the *bona-fide* owner, and she wholly failed to sustain it. [Star v. Penfield, 166 Mo. App. 302; Snyder v. Free, 114 Mo. 360, 369.] Not only did she fail to sustain such burden of proof, but the evidence of the witnesses *introduced by her* shows that all such property was in fact the property of her father so far as his creditors and the bankruptcy authorities are concerned. This would include all property acquired for use in the business by her father as her so-called agent and all the property she purchased or obtained "thru the conduct" of said business by her.

Some of the property she claims to have owned prior to her father's bankruptcy is claimed to have been obtained by her for her work in assisting him in the business from the time she was a small girl in the family until her marriage. But this was while she was a member of his family, doing only what the daughter-in-the-household would ordinarily do; and there is no evidence whatever to show that she was to receive pay for it or be compensated in any way therefor. Taking out all of the property connected with the business and the articles claimed to be owned by her mother, *may* leave some *personal* articles belonging to her which, in the present state of the record, perhaps could be said to belong to her individually as the daughter of the house, i. e., the piano, a few beads and trinkets, and possibly her bedroom set. But, aside from the piano and jewelry, there is no showing what they were, nor of their value, and if she did own any such, it is quite clear that she did not, as girls usually do when they marry, take them away when she left the parental roof to go with her husband to their newly established Wyoming home. Indeed, not only after her marriage in 1920, but even after her father was declared a bankrupt in 1923, and on down through the long years of litigation in the bankruptcy court when all of the bankrupt's property was in his possession and, therefore, constructively in the possession of the bankruptcy authorities, she allowed this property she now claims to be hers to remain in the bankrupt's possession with nothing whatever to show that he held it as her agent, and nothing to prove it, save her and her father's bare word that such was the true situation.

The foregoing paragraph is not, as charged, a comment on the weight of the evidence and an infringement on the prerogatives of the jury. It is a just and proper comment on the *insufficiency* of the evidence to show that the property or any substantial portion thereof was in payment of services performed, and of money earned, by plaintiff while living as a member of her father's household. I think I have demonstrated that the case should be at least reversed and

remanded for a new trial, not only because of error in instructions, but also because of the diverse ownership of the property charged to have been converted, and the absence of evidence as to the value of that part, if any, for which plaintiff *may* be entitled to sue for its conversion and obtain, as damages, the value thereof, and because the verdict which was rendered does not confine itself to such property but gives plaintiff damages for the taking of the whole of said property. This opinion could have contented itself with simply reversing and remanding the case for any one of the errors noted, but this would result in allowing the case to be tried anew with all the other errors remaining therein.

*Bland* and *Arnold, JJ.*, concur in the result, but in a separate opinion by *Bland, J.* The judgment is, therefore, reversed and the cause remanded.

## Concurring Opinion.

BLAND, J.—I am unable to agree with Judge TRIMBLE that defendant is now in a position to urge that his demurrers to the evidence should have been sustained because there was no proof of the value of the separate items of property claimed to have been converted and that plaintiff has failed to show that she was the owner of all of such property.

The property claimed to have been converted may be divided into three classes: (1st) That owned by plaintiff's mother, (2nd) That "given" to plaintiff by her father when he was insolvent, and (3rd) That acquired by plaintiff from other sources than from her father. Under the last class, the evidence tends to show that plaintiff owned much more property than Judge TRIMBLE gives her credit. A substantial part of the property taken by defendant consisted of furniture that plaintiff acquired as wedding presents and by purchases made by her from money given her by guests at the hotel. However that may be, Judge TRIMBLE admits that there was evidence that she was the *bona-fide* owner of some of the property.

All of defendant's instructions in the nature of demurrers to the evidence were general. There was no instruction withdrawing from the jury the furniture that plaintiff acquired from her father as a "gift" when he was insolvent, or the mother's furniture and, defendant, in at least two instructions, submitted to the jury the question of whether there was a fraudulent conveyance by the father of the "gift" property. In one of defendant's instructions the matter of whether some of the property was the mother's was submitted. It makes no difference whether there were actually a fraudulent conveyance by the father, if defendant tried the cause on the theory

that the matter was for the jury he is bound by that theory on appeal, regardless of how strongly we may feel that the evidence conclusively shows that the conveyance was fraudulent. Defendant was not forced to submit the matter to the jury on account of the fact that his general demurrers to the evidence were overruled. Had there been no evidence that plaintiff had taken other property than that given her by her father, then the demurrers would have raised the question. However, in view of the evidence in this case, that question could have been raised only by an instruction withdrawing that class of property from the jury, but defendant, not having offered such an instruction and of course, none such was refused by the court, he was not forced to submit to the jury the question of fraudulent conveyance.

There is no merit in the complaint that the demurrers to the evidence should have been sustained because there was no evidence of the separate values of the various classes of property I have mentioned. Plaintiff introduced evidence clearly tending to show that she was the *bona-fide* owner of some of the property. As defendant took that property she was entitled to at least nominal damages and defendant offered no instruction confining her recovery to such damages. Therefore, defendant is not now in a position to contend, and could not have contended in the motion for a new trial, that there was no evidence of the value of the property owned by plaintiff and taken by him. The point was not attempted to be raised in the trial court in any other way that I can find in the record. However, the fact that defendant did not challenge the sufficiency of the evidence as to the right of plaintiff to recover, did not justify the court in assuming that the property sued for was owned by plaintiff, as was done in plaintiff's instruction No. 5. Defendant tried the case on the theory that there was evidence for the jury's consideration that plaintiff was the *bona-fide* owner of the property taken and not that such evidence was true or conclusive. I, therefore, concur in reversing the judgment and remanding the cause as to the recovery of actual damages.

I do not concur in what Judge TRIMBLE says in reference to the instruction on exemplary damages. The word "allow" is not a technical term and the jury was as well qualified to pass upon the meaning as are we. The word is not equivalent to the word "must" and is in no sense a command. I am not convinced that the jury was misled when it read together the two instructions on this subject. However, I am, by no means, saying that the instruction containing the word "allow" is approved as a model for future use.

I think that Judge TRIMBLE has fairly stated the evidence bearing on the question of exemplary damages and, while I do not agree in all of his comment in reference to the same. I do agree that there was

not sufficient evidence to submit to the jury that element of damage. I therefore concur in reversing the judgment *in toto* and remanding the cause.