**ROBERTS CONSTRUCTION COMPANY, a corporation, Appellant (Defendant below),**

**Lloyd Cole and Blanche L. Cole, (Defendants below),**

**v.**

**Gilbert G. VONDRISKA and Rhea K. Vondriska, Appellees (Plaintiffs below).**

**No. 4461.**

Supreme Court of Wyoming.

March 17, 1976.

Rehearing Denied May 13, 1976.

Carl L. Lathrop, of Lathrop, Uchner & Mullikin, P.C., Cheyenne, for appellant.

Wade Brorby, Gillette, for appellees.

Before GUTHRIE, C. J., and McCLINTOCK, RAPER, THOMAS, and ROSE, JJ.

## UPON REARGUMENT

McCLINTOCK, Justice.

Roberts Construction Company[1] appeals from the judgment of the District Court of Crook County, Wyoming entered June 12, 1974 which in principal part required Roberts by July 1, 1974 to remove all stockpiles, debris, and equipment from lands belonging to the plaintiffs. The judgment also gave plaintiffs permission to examine books and accounts of Roberts pertaining to limestone production under a quarry agreement,[2] required Roberts to restore a gate which had been removed by Roberts and awarded $500 as punitive damages for interference with the gate, and also awarded plaintiffs $25 as nominal damages for Roberts' violation of the Wyoming Air Quality Act. Costs in the amount of $1,150, representing one-half the cost of aerial photographs and surveys obtained by plaintiffs for use in the course of the trial of the action, were awarded to plaintiffs. Insofar as this judgment determines that plaintiffs are entitled to discontinuance of use of their lands for stockpiling and storage purposes we are in agreement therewith, but modify the judgment in certain other respects.

In the spring of 1960 Lloyd Cole and his wife, being the owners in fee of a tract of land which we shall hereinafter refer to as the "quarry tract" and having a lease[3] on lands which will be referred to as the "stockpile tract," gave Roberts oral permission to open a limestone quarry on the quarry tract and at that time suggested that the stockpile tract be used for the purpose of stockpiling limestone removed from the quarry.[4] At this time the Coles were in the process of selling their ranch to Delvin C. Cooper and his wife, and after

---

1. Defendant below and hereinafter referred to as "Roberts." Gilbert and Rhea Vondriska will be referred to as "plaintiffs."

2. Neither side takes any exception to the judgment of the court in this respect.

3. The lease to Cole from one Irene Oppenheimer is not in evidence but was described by Cole without objection as a written lease which "didn't specify what it was for. * * * It was just a lease. It just said they leased it to me without qualification."

4. Cole testified that he had "the first right to buy" the Oppenheimer lands; that he explained this to Roberts and suggested that since the quarry tract land was better than the Oppenheimer land it would be preferable to use the latter land for stockpiling, but that if he did not acquire it Roberts some time in the future might have to move the stockpiles back to the west and continue the operations over there. C. D. Roberts, president of Roberts, testified that Cole wanted his company to put the stockpile where it was and leave a field that Cole had planted in oats "and that's what we have done since 1960, * * * we have had the use of it all these years. We were directed to use it, even Bud Cooper."

consummation of the sale [5] and under date of July 25, 1960 the Coopers entered into a written agreement with Roberts as to the mining of limestone on the quarry tract, being the SW/4NE/4 and SE/4NW/4 of Section 11, T. 51 N., R. 63 W., 6th P.M., Crook County, Wyoming, together with other lands not here pertinent. This agreement specifically granted Roberts the right to "maintain on said premises stock piles at all times" but did not describe or in any way refer to the stockpile tract. The evidence establishes without contradiction that Mr. Cooper was aware of the use that was being made of the stockpile tract and never objected thereto. The record does not disclose whether the then owners of this tract were aware of the use or that they consented thereto.

In 1967 or 1968 the Oppenheimers indicated to Cole their willingness to sell their 160 acres and an arrangement was worked out whereby they conveyed directly to the Coopers, retaining a one-half mineral interest, and the Coopers then transferred to Cole the remaining one-half interest as to limestone only. [6] The written transfers of these interests were not effected until some time in 1971 when the Coopers sold their interest in all lands to Clayton H. Talley under a contract for deed dated March 15, 1971. The testimony also shows that Talley knew of the quarry and stockpiling operation and made no objection thereto.

Under date of July 11, 1972 Talley's executor and principal devisee entered into a written contract of sale of the ranch to plaintiffs in which the buyers "acknowledge that they are familiar with the Roberts contract" and that while seller does not reserve any mineral rights, buyers "must

purchase subject to the prior reservation of minerals and the contracts in regard to said minerals which are now in effect." It is specifically provided that exception to title cannot be based on the "Roberts lease, dated July 25, 1960 and recorded in * * * Records of County Clerk of Crook County, Wyoming."

Plaintiffs were first on the ranch in 1969, and in 1971 had some negotiations with the Coopers for the purchase thereof and looked at the area, including the quarry and stockpile, but did not proceed further. Their purchase in 1972 can properly be found to be with actual knowledge of the existence of the quarry and the stockpiling although there is nothing to show that they were then aware of the specific legal subdivisions that were involved in these operations. [7] The record shows no objection on their part to the maintenance of either the quarry or stockpile until the filing of this action, although in February of 1973 they attempted to renegotiate the terms of the quarry agreement, without mention of or complaint about the maintenance of the stockpile. Nothing resulted from these and further negotiations held in April, 1973, and on July 3, 1973, without further demand or notice from plaintiffs to Roberts, this action was commenced, alleging in pertinent part that defendant had for more than three years wrongfully and unlawfully used plaintiffs' lands outside the quarry tract for stockpiling of limestone, removing the topsoil therefrom and killing vegetation, and had used more than one means of ingress and egress and permitted large trucks to drive over lands outside the quarry tract. On this phase of the action injunction against further use of the lands outside the quarry tract is requested, as well as

5. Cole's possession under the Oppenheimer lease was transferred to the Coopers but Cole testified that he retained the lease, "I had a mortgage on it."

6. While there was some dispute in the trial court about the nature of the retained Cole interest the issue seems to have been settled in favor of Cole and no question is raised in this court as to whether an interest in limestone or gravel constitutes a mineral inter-

est. Nothing that is said herein should be construed as bearing upon that question.

7. The record does not establish that any of the Coopers, the Talleys, or Vondriskas ever had specific knowledge prior to the taking of aerial photographs and making ground surveys by a licensed surveyor, as to what legal subdivision either the quarry or stockpile was located upon.

compensatory and punitive damages for improper use of the lands. The trial court found in plaintiffs' favor as to the wrongful use of 16.13 acres of land outside the quarry tract but that plaintiffs had proved no damages resulting from the wrongful use. Judgment was then entered as we have indicated in the opening paragraph of this opinion. Compliance with the judgment has been stayed by filing supersedeas bond.

In its brief Roberts claims that it is entitled to continued possession of the stockpile tract, free from interference by the plaintiffs, on the basis that, first, the plaintiffs "purchased the ranch subject to the rights of Roberts in said 16.02 acres and with knowledge of the use thereon" and, secondly, that these "16.02 acres for stockpiling purposes are appurtenant to the lease agreement of 1960 and confers upon Roberts an easement in said premises for the term of the lease."

■ There can be little dispute that the plaintiffs took with actual knowledge of Roberts possession and use of a part of the purchased premises as a quarry and another part thereof as a location for the stockpile, but that fact alone does not establish that Roberts had any continuing or enforceable rights in the stockpile tract. We must therefore direct our inquiry to determine the rights of Roberts under the facts above set forth.

While the language of the second proposition is somewhat obscure we interpret it to propose that the lease agreement confers an easement in the stockpile tract.

Roberts relies principally upon the case of *Owsley v. Hamner,* 36 Cal.2d 710, 227 P.2d 263, 24 A.L.R.2d 112 (1951). The plaintiffs in that case had acquired a building a portion of which had been leased to the defendant by plaintiffs' predecessor. A patio and passageway useful but not absolutely essential to the use of the leased premises were not mentioned in the lease but had been shown in plans in existence at the time the lease was made. The California court recognized as a general proposition that everything which belongs to the demised premises or is used with and appurtenant to them and which is reasonably essential to their enjoyment passes as an incident to them, unless specially reserved,[8] and further stated the test to be whether such easements are " 'reasonably necessary for the beneficial enjoyment of the property leased.' " [9]

■■ In the case before us the use of the stockpile tract was not reasonably necessary for the beneficial enjoyment of the quarry because the quarry agreement specifically gives Roberts the right to stockpile on lands covered by the agreement. Moreover, the ownership of the quarry tract was separate and apart from the ownership of the stockpile tract, the latter not being owned by Cole at the time of his oral agreement with Roberts, nor by Cooper at the time of his written agreement. It has been said that "a mere tenant cannot grant a license to a stranger," 1A Thompson on Real Property (1964 Repl.), § 217, p. 197; *Webb v. Arterburn,* 246 Iowa 363, 67 N.W.2d 504 (1954). While we might qualify this statement to indicate that a tenant legally in possession might grant to another a right to use a portion of the leasehold for some purpose not inconsistent with the lease, he could not create any rights running beyond the term of the lease. Cole specifically advised Roberts that he had only a lease and "a first right to buy" the Oppenheimer land so that at some time Roberts might have to move the stockpiles. Roberts accepted this and started stockpiling with full knowledge that its continuing right to use the land was uncertain.

We therefore cannot agree with Roberts' argument that the right to stockpile was an appurtenance or implied covenant of the mining lease. The fact that Cooper, who

8. *Owsley v. Hamner, supra,* 227 P.2d at 267, quoting from 36 C.J. 30 § 632, p. 30.

9. *Id.* at p. 268, quoting from *Bellon v. Silver Gate Theatres, Inc.,* 4 Cal.2d 1, 10, 47 P.2d 462, 467.

executed the written mining agreement, subsequently acquired title and made no objection to the continuance of the stockpile might be of some significance in applying principles of estoppel but not as incorporating the stockpiling consent into the written lease.

■ There is little doubt in our minds that the enforcement of oral licenses against attempted revocation is based on principles of equitable estoppel. Summarizing briefly from 28 Am.Jur.2d Estoppel and Waiver § 35, p. 640 et seq. the elements of such estoppel, we find that the person estopped must be guilty of conduct which amounts to false representation, intention that such conduct be acted upon, and have knowledge of the real facts. The party claiming the estoppel must be without knowledge or means of knowledge, rely in good faith upon the conduct or statements of the other party, and either take action or refrain therefrom so as to change his position to his injury or prejudice. Application of the doctrine depends upon the facts of each particular case and "manifestly there can be no equitable estoppel if any essential element thereof is lacking or is not satisfactorily proved." *Id.* at 641.

*Coumas v. Transcontinental Garage, Inc.,* 68 Wyo. 99, 125–126, 230 P.2d 748, 757 (1951) involved a situation where the owner of an existing building, one of whose walls was built flush with the lot line, gave oral permission to an adjoining land owner to use that wall as part of a new building. After analyzing earlier Wyoming cases this court said:

"We think that this court under these decisions is committed to the rule that in the proper case a parol license to use part of the real estate of another becomes irrevocable when a license is executed, and when the licensee *in pursuance of and in reliance thereon has incurred expenditures of money or labor in making improvements of a permanent character.* It has become a rule of property which should not be lightly repudiated.

"What has been said does not mean that all licenses, followed by expenditures of money or labor, result in the irrevocability thereof, or that the same relief will be given in all cases. It has been said that each case depends 'on the nature of the license and other circumstances and on whether a revocation in a given case would amount to a fraud upon the rights of the licensee.' 53 C.J.S., Licenses, § 90, p. 816." [Emphasis supplied]

Other statements in the opinion make it clear that the expenditures must be made on the strength of the license and not merely incidental thereto. In response to the objection that plaintiff had shown only the cost of the building and not of the particular wall which was all that could be considered as the amount spent on the strength of the license the opinion concedes that there was some merit in the objection. However, it took judicial notice that it would then cost two or three times the original cost to build the wall and continued, 68 Wyo. at 136, 230 P.2d at 762:

"Thus the detriment which plaintiffs would incur by a revocation of the license involved in this case would be large, the plaintiffs could not be put *in statu quo,* and it would, we think, be unjust to revoke the license now, and it should not be permitted as long as conditions remain substantially as they are now."

In the present case the trial court has found generally in favor of the plaintiffs. We do not think that it can be said that the license had been executed, in the sense that it could have been so found in *Coumas,* because in that case the building had been erected as a permanent improvement to plaintiffs' land. Here Roberts asserts only the continuing right to stockpile and no improvements of any kind have been erected. Nor is there anything in the record to indicate that permanent improvements have been made to its own property. While the vice-president of the company

testified that some $600,000 had been spent for quarry equipment, "just for the production and stockpiling," there is nothing to show that this was in any sense a permanent improvement. The evidence does not go into the manner in which the quarry is operated but in the absence of a showing that the equipment is permanently placed upon the land and irremovable therefrom, at least without great expense, we must assume that it is all movable.

Nor do we find in the record any evidence that any expenditures were made on the strength of the permission to use the stockpile tract. While it is clear that sums of money have been spent for a number of years in removing limestone from the quarry, placing it on the stockpile tract, and then removing it from the stockpile tract, it does not appear that any of these operations were in any way peculiar to or irrevocably required the use of this particular tract. These are expenditures which would have had to be made if the limestone was piled on the quarry tract which as we have pointed out Roberts had the full right to under its lease. There is no evidence that, given a reasonable time in which to remove the stockpile from its present location, Roberts cannot commence using the leased land for stockpiling purposes. Strange as it may seem that plaintiffs should prefer to reacquire the use of land which is apparently unsuitable for agrarian purposes and to permit destruction of land which is now suitable for agricultural use, we must conclude that the judgment of the district court is supported by proper evidence and that plaintiffs have and had the right to revoke the permission previously given by a nonowner of the land, tacitly continued by two owners of the land, and acquiesced in by plaintiffs until the filing of this action. We therefore conclude that the trial court was correct in its determination that no permanent or irrevocable license had become vested in Roberts to use the stockpile tract.

■ However, this does not mean that Roberts throughout these years, even after the acquisition of the property by plaintiffs, has been or upon the date of revocation became a trespasser.

"A license is revoked * * * by the commencement of an action for damages by the licensor against the licensee. A license cannot be revoked so that the licensee will be liable in trespass for his acts done in pursuance thereof.",

1A Thompson on Real Property (1964 Repl.), § 234, p. 232, and the right of revocation "is subject to the licensee's right to a reasonable time after revocation in which to remove his chattels". *Id.* at p. 230.

■ We think the trial court had this rule in mind when in its judgment entered June 12, 1974 it allowed Roberts until July 1, 1974 to clean up the premises. Roberts does not in its brief argue that such time was unreasonable or that it would be impracticable to remove the pile within a period of approximately 20 days. No evidence was presented on the issue before the trial court and in the absence of such evidence and objection to the implied finding of the trial court that this was a reasonable time we must conclude that the time allowance was adequate. Roberts has chosen to appeal the matter upon stay of proceedings and must be charged with its own failure properly to appraise the chances of the appeal. As we interpret the stay order, it had the effect of extending time for compliance with the judgment only from June 28, 1974, so that upon entry of judgment on mandate Roberts will become a trespasser unless within three days of the entry thereof it removes the stockpile and other debris from the plaintiffs' lands. Damages for delay caused by the taking of the appeal and posing of the supersedeas can of course be fixed upon application under Rule 65.1, W.R.C.P.

Count III of the second amended complaint seeks rescission of the mining contract or in the alternative an allowance of damages because of Roberts' alleged failure to comply with the terms thereof.

Among other things it is alleged that Roberts "has refused to close the gates of the Plaintiff and has, in fact, locked said gates open." In addition to denying these allegations in its answer Roberts by counterclaim asserted that since 1960 it had used certain roads as a means of ingress and egress to and from the quarry and that plaintiffs had intentionally and maliciously placed gates across the roads in order to obstruct and interfere with defendant's operation and deny the right of ingress and egress given by the mining contract. Injunctive relief and damages were sought because of this interference.

Upon the trial of the case it was established that in the spring of 1973 and before the filing of the second amended complaint Vondriska had installed some fencing, with gate, across one of the roads leading to the quarry. This gate did not prevent use of the road by Roberts but did present the usual difficulties and delays involved with opening, passing through and closing gates. During the period from its installation until July of 1973 a bitter game developed between Roberts' employees and the Vondriskas, with the former leaving the gate open at all times when they went through and the Vondriskas closing it any time they found it open. This game came to an end in July of 1973, when defendant's two principal officers deliberately and intentionally pulled the gate from its foundations. We think the record would justify a finding that plaintiffs considered the installation of the gate a reasonable matter of protecting their livestock. There is no doubt that Roberts' officers and employees considered it a nuisance and an unreasonable restriction upon their claimed free right of ingress to and egress from the quarry.

The judgment contains no general finding in favor of the plaintiffs upon their various claims but with specific reference to Count III the trial court found that defendant had breached the agreement "in some of the respects alleged" but that plaintiffs had failed to prove special or actual damages and were not entitled to rescission of the agreement. It also found that "defendant should restore the gate across the canyon road to its original condition" or in the alternative provide a suitable auto gate, and that plaintiffs should be awarded $500 "as punitive damages for the destruction of the gate and blasting without notice." The court further found "against the defendant and in favor of the plaintiffs on all counts contained in defendant's Counterclaim." As part of the decree Roberts was ordered to restore the gate or install suitable auto gate and plaintiffs were awarded $500 "as punitive damages upon Count III."

Roberts' notice of appeal is sufficient to raise the question as to the validity of the trial court's order for restoration of the gate but no contention is made in the brief concerning this aspect of the case, nor is any point raised concerning the denial of defendant's counterclaim. In pertinent part the brief attacks the finding and judgment that plaintiffs were entitled to punitive damages, it being asserted that "there is no evidence or law to support the award of punitive damages of $500 to the Plaintiffs for destruction of a gate and blasting of a roadbed without notice to the Plaintiffs." We were informed in oral argument that defendant had replaced the gate with a cattleguard and plaintiffs have not questioned its sufficiency.

 We therefore do not interpret Roberts' brief and argument in this court as raising any question as to the propriety of the order of restoration and in keeping with the general rule that complaints not substantiated by argument or brief may be considered as waived, *Booth v. Hackney,* Wyo., 516 P.2d 180, 185 (1973), and *Schaffer v. Standard Timber Co.,* 79 Wyo. 137, 144, 331 P.2d 611, 613 (1958), we consider that Roberts has waived any claim it might have asserted that the trial court erred in sustaining the right of plaintiffs to install the gate under the circumstances of this case. Moreover, we believe that the legality of the gate is to be determined under

the principle enunciated in the annotation in 52 A.L.R.3d 9, 19–20:

"Despite the existence of a number of general rules, the lawfulness of a gate or fence across a right of way remains a question of fact, the courts looking at various factors and balancing the right of the servient owner to use his land, with the right of the right-of-way owner to use his right of way. That the lawfulness of a gate or fence is a question of fact is consistent with the more general proposition that what may be considered a proper use by the owner of the land subject to an easement, generally, is a question of fact."

This court will not substitute its judgment for that of the trial court where there is substantial evidence regarding the fact, *In re Stringer's Estate,* 80 Wyo. 389, 343 P.2d 508, rehearing denied 345 P.2d 786 (1959), and we consider that Vondriska's testimony concerning their need for fence and gate control and testimony of Roberts' officers concerning their need of free and unrestricted access presented a question of fact for the trial court.

It follows that under the view of the trial court plaintiffs were entitled to money damages for the tearing out of the gate and it was only because of the substitution of remedy, apparently acquiesced in by Roberts, that money damages for the wrongful act were not allowed. The case is therefore not within the scope of *Martel v. Hall Oil Co.,* 36 Wyo. 166, 253 P. 862, rehearing denied 255 P. 3 (1927), where it was held that punitive damages should not be allowed in the absence of award of compensatory damages.

Roberts' main reliance is upon *Waters v. Trenckmann,* Wyo., 503 P.2d 1187 (1972), where it was held that punitive damages are not ordinarily allowed in contract cases. This case would be applicable if we interpreted the judgment only as allowing damages for breach of contract and not for tort. We would not so narrowly construe the judgment and believe that

while the mining agreement may have been significant in determining the basic rights between the landowner and the right-of-way owner, the decision of the trial court is essentially that Roberts committed a tort for which redress should be given.

In territorial days this court stated the principle which has generally governed in the granting of punitive damages:

"\* \* \* Punitive or exemplary damages may be awarded in cases where personal injuries have been committed through wantonness or even gross carelessness of one party upon another, but there should be clear and unmistakable evidence of an intention to do the personal injury complained of, before the jury would be justified in finding an amount greatly beyond the actual loss sustained by the person injured." *Union Pacific Railroad Co. v. Hause,* 1 Wyo. 27, 35 (1871),

but a more detailed discussion and one more pertinent to the facts of this case is set forth in *Cosgriff Brothers v. Miller,* 10 Wyo. 190, 235 et seq., 68 P. 206, 216 et seq. (1901) in which Chief Justice Potter, speaking for the court, reviews the principles pertaining to allowance of punitive damages, with particular reference to Sutherland on Damages, 10 Wyo. at 236, 68 P. at 216:

"\* \* \* He states the rule in various ways, but the act to authorize the infliction of such damages must, under any statement of the rule, have been done wantonly, recklessly, or maliciously. \* \* \* 'If a wrong is done willfully, (that is, if a tort is committed deliberately, recklessly or by willful negligence, with a present consciousness of invading another's right or of exposing him to injury), an undoubted case is presented for exemplary damages.' (Id. at 724)."

The Chief Justice then concluded that: "\* \* .\* the doctrine of exemplary damages is not only thoroughly ingrafted upon the jurisprudence of this country, but that it is a salutary one, and we are

not prepared to hold that it should not be allowed in proper cases in this state." 10 Wyo. at 237, 68 P. at 217.

The case involved a matter of deliberate trespass upon the lands of another by placing flocks of sheep to graze on lands claimed by Miller, and the opinion continues, 10 Wyo. at 238, 68 P. at 217:

"* * * This is not a case where defendants claimed any ownership in the lands leased by Miller. Had they done so in good faith, upon some reasonable foundation, a different question would have been presented. The right they claim (and doubtless it was claimed in good faith) was to depasture, not their own premises, but those of another. That sort of claim, although preferred [sic] in good faith, under a mistaken notion of the law, cannot be regarded as a claim of right sufficient to absolve a trespasser from liability to exemplary damages, where the case otherwise is such as to warrant their infliction."

The same chief justice, in *Hall Oil Co. v. Barquin*, 33 Wyo. 92, 237 P. 255 (1925), again discusses principles applicable to such damages and reviews at some length the decisions from other states, with more particular reference to the claim that a trespass was made in good faith and therefore no punitive damages should be allowed. In one case so cited, *City of Clinton v. Franklin*, 119 Ky. 143, 83 S.W. 142, 143 (1904), city authorities, without plaintiff's consent, had entered upon the land, dug up the soil, torn down the fence, and constructed a plank sidewalk, claiming that they had the right to do this under a city ordinance. It was said to be shown by the evidence

"* * * that its officers and agents were repeatedly notified by appellee, before they began to construct the sidewalk, that they were preparing to place it upon his lot, and warned not to do so, to all which they gave no heed, but persisted in putting it upon his land, in doing which they ignored his rights, and neglected every means of informing themselves as to the true location of his boundary line."

A quotation in *Hall* from *Richwine v. Presbyterian Church*, 135 Ind. 80, 34 N.E. 737 (1893), although not involving the allowance of punitive damages is also pertinent here on the question of good faith, 33 Wyo. at 148, 237 P. at 274:

"'* * * Appellant acted with his eyes open, and at his own peril. He was not taken advantage of, nor unawares; but, after suit was brought to enjoin his entering upon the premises, he deliberately proceeded to do what the court was about to decide whether he had a right to do or not. The court having decided against him, he cannot now be heard to claim that he was an occupant in good faith; he took the hazard, and must abide by the result. * * *'"

The position which we believe we must take in this case is summarized in one of a number of other cases cited in *Hall*, *Best v. Allen*, 30 Ill. 30, 81 Am.Dec. 338, 339 (1862):

"Here was an unwarrantable attempt by the defendant to take the law into his own hands, in a case where he had no right to take the possession, and even if his title had been good he should have brought ejectment to obtain the possession."

Chief Justice Potter concludes this portion of the opinion in *Hall* with this statement, 33 Wyo. at 149, 237 P. at 275:

"* * * As we have held above, the facts shown in evidence were sufficient to warrant the jury in finding that the purpose of defendants was to drill a well upon the land regardless of their legal right to do so, even though they may have believed at the time that the lease gave them a legal right. And, beyond that, the verdict discloses that the jury found against the defendants upon the facts as to the matter of their alleged good faith."

There is no question that the acts of Roberts' officers in this case were willful

and deliberate. Alan Roberts testified to the effect that plaintiffs' lawyer had told the company's lawyer that there would be no more games and directly that,

"I swore that if that gate was there when I went down it was coming down, * * * I hooked a cable on the back of my pickup and put it around the gate post and gave it a jerk. The gate didn't —the cable slipped off, so I back up and jerked it again and the gate flew up and went over on the other side of the post where it was partially broke or cracked."

His father testified:

"Q. And you and Alan deliberately went down there to tear the gate out, is that correct? A. Absolutely."

After testifying that the gate had been left in that condition and that it could be used again if the Vondriskas would put another post in the ground he proceeded:

"Q. And if they did would you tear it down again? A. I would have to think about it."

Here is a deliberate and willful act, perhaps induced by the desire for speed in the conduct of the mining operations, but in any event constituting a willful interference with the property of another. Under these circumstances we do not think that the case of *Condict v. Hewitt*, Wyo., 369 P.2d 278 (1962), where it was held that the use of foul language constituted sufficient provocation to a beating to rule out allowance of punitive damages, is pertinent. Perhaps here it could be said that plaintiffs provoked the Robertses to do the act they did but it would hardly be a legal justification therefor because the issue of the right to maintain the gate was then before the court and awaiting disposition. Here was an unwarranted attempt to take the law into their own hands.

The question of whether the act was willfully and wantonly done was a question of fact for the trial court and by its judgment the trier of the fact has found that Roberts had no right to remove the gate and that its officers made an unwarranted attempt to take the law into their own hands. For us to reverse that decision would require us to substitute our judgment of the facts for that of the trial court or hold as a matter of law that such deliberate and willful acts did not justify allowance of punitive damages. This we decline to do.

Count IV of plaintiffs' second amended complaint alleges in pertinent part that Roberts has maintained primary and secondary rock crushers,

"and allowed discharge and omission [sic] of contaminants in a form so as to cause pollution, which violates the rules, regulations and standards as adopted and promulgated by the State of Wyoming. "3. That the Defendant, Roberts Construction Company, has, during the past year, wilfully failed to comply with the air quality standards and has allowed the discharge and omission[sic] of contaminated air in violation of Wyoming law.",

which acts of the defendant are alleged to have injured the plaintiffs in the sum of $25,000.

Roberts contends that the record is devoid of any evidence that it had willfully failed to comply with air quality standards or that Roberts had violated any standards. It is argued that the trial court has fined Roberts for not being in compliance with rules and regulations of the Wyoming environmental laws and that such authority is not given the court under § 35–502.46 et seq., W.S.1957, 1975 Cum.Supp.

In response to this plaintiffs refer briefly to the evidence showing the lack of emission control equipment, the fact that the old crusher was never designed to control particulates or emissions, and that while the company had water sprays on the secondary crushers they were not used all the time. Reference is made to testimony of Mrs. Vondriska that there "was quite a bit of visible dust emanating from the mining operations which had serious effects on her son and causes more cleaning." It is then argued that the facts speak for them-

selves and that this court should examine only the evidence most favorable to the plaintiffs, giving it every reasonable inference, *Wyoming Game and Fish Commission v. Latham,* Wyo., 347 P.2d 1008 (1960).

 Conceding that the evidence should be viewed in this light, we think that it fails to establish any actionable wrong. We know that pollution of all types, air, water, and land, is of growing concern and we in no way denigrate the efforts of the legislature to protect environmental quality, and this court shall at all times be ready and willing to afford such remedies as are within the law. For purposes of this case, certainly, we would accept the proposition that if there are violations of state or federal laws designed to protect the air quality and an individual suffers injury peculiar to him and not as suffered by the public in general, the courts should be available to that individual to give redress. But in the case at bench there has been no showing as to rules or regulations which may have been violated; there has been no showing that orders of the supervisory authorities have not been complied with or at least compliance therewith extended. We do not think that the plaintiffs have established a case within the issues posed by their complaint and therefore eliminate the allowance of $25 as nominal damages awarded on this fourth claim.

 Roberts complains that the allowance of $1,150 costs, representing one-half the cost of obtaining surveys showing the 16.13 acres of land which have been used

for stockpiling and storage of equipment and junk, is erroneous, asserting that allowance thereof is in violation of § 1–221, W.S.1957 [10] as interpreted by this court in *Martel v. Hall Oil Co.,* supra. The cited statute would appear to have application only if we ruled that the allowance of $500 as punitive damages was incorrect. We have already held that there was basis for this allowance of punitive damages and have consented that actual damages were sustained through the willful removal of the gate, so it may be that only because the trial court ordered the gate restored rather than allowing money damages is the statute even pertinent. We find Roberts' position without merit on this point.

 However, we think that there are strong reasons for considering Roberts' objection to the allowance of this claim for costs on grounds other than those just mentioned.[11] What constitutes proper costs in an action, to be assessed against the losing party, is not very clearly established by either statute or rule. Chapter 14 of Title 1, W.S.1957, entitled "Fees and Costs and Security Therefor," contains several provisions relating to the allowance of costs, but nowhere is there a statutory enumeration of what charges are included. Rule 54(d) provides that "* * * costs shall be allowed as of course to the prevailing party unless the court otherwise directs," but again there is no definition as to what expenses of the trial should be included.

In *Mader v. Stephenson,* Wyo., 481 P.2d 664, 665–666 (1971) this court considered an allowance of costs representing one-half the cost of obtaining a survey of an ease-

10. "When the judgment is less than one hundred dollars, unless the recovery be reduced below that sum by counter-claim or set-off, each party shall pay his own costs * * *."

11. In *State Highway Commission of Wyoming v. Triangle Development Co.,* Wyo., 371 P.2d 408 (1962) (on rehearing) this court specifically refused request for rehearing based on the fact that the opinion had considered a matter which had not been argued. Referring to the earlier case of *Wyuta Cattle Co. v.*

*Connell,* 43 Wyo. 135, 299 P. 279, rehearing denied 3 P.2d 101 (1931), it was said that an appellate court cannot be expected to prosecute an independent inquiry for errors upon which the appellant may possibly rely and may invoke abandonment by waiver, but is nevertheless at liberty to decide a case upon any point which would result in a miscarriage of justice if we did not here consider the matter of costs upon the basis of the whole record and our previous decisions on the matter.

ment which plaintiff claimed across lands of the defendant. It was there said:

"The weight of authority seems to be, as stated in 20 C.J.S. Costs § 219, pp. 463–464, that the expense of procuring surveys, maps, plats, plans or photographs is not taxable as costs unless there is clear statutory authority therefor. [Citing authorities]

"This court held in *Wyoming Central Irr. Co. v. LaPorte*, 26 Wyo. 522, 188 P. 360, 362, the matter of costs is purely statutory as costs were not allowed as a rule at common law. We of course have no statute which purports to authorize the charging of such a survey as is here involved, as an item of cost."

Notwithstanding this rather plain statement refusing to allow expenses of surveys as costs, plaintiffs refer to this case and quote what appears to us to be a somewhat self-contradictory statement in which it is indicated that there may be circumstances, not found in that case, which justify the charging of such survey expenses as costs. Perhaps the trial judge was persuaded by the circumstances of this case to apply the dictum but we think the remark was unfortuitous. Moreover, we think that plaintiffs' argument that the allowance was proper and within the trial judge's discretion where the items are necessary for the proper determination of the case fails for want of any showing that the expense was necessary. We cannot read the answer and counterclaim of Roberts as seriously disputing the fact that the stockpile was on lands which were not covered by the quarry lease. If there was a doubt about this, a request for admission should quickly have established what Roberts contended. Similar requests could have established with reasonable certainty the extent of the used area. If the admissions were refused or were insufficient then a survey limited to the determination of disputed matters pertinent to the real issues could have been ordered and conducted so as to invoke sanction provisions of Rule 37(c). This rule expressly refers to and allows expenses involved in proving an improperly disputed matter.

It is fairly clear from the record that this particular survey was made prior to the institution of the action without any real knowledge or belief whether a survey of such detail was required. Further, although Dr. Vondriska testified that he had paid $2,200 for the survey, and the surveyor testified that it took him about a week, there was no evidence before the trial court that such charges were reasonable, an element that has always been required with respect to proof of damages. We do not think that a less stringent rule should be applied under the guise that costs and not damages are being awarded.

We therefore affirm the judgment of the trial court insofar as it permitted the revocation of the license for use of the stockpile tract and allowed punitive damages for destruction of the gate, but would modify it by striking therefrom the allowance of $25 as nominal damages for injury to air quality and the allowance of $1,150 as part of the costs of the action.

RAPER, Justice (concurring in part and dissenting in part).

I must respectfully dissent from the views of the majority in two particulars: (1) I would hold that the defendants had an irrevocable license to use the 16.13 acres of land in question; and (2) I would deny any recovery of punitive damages by plaintiff against defendant. I otherwise concur with the majority.

While I have no dispute with the recitation of facts by the majority, it is my belief that they ought to be presented in a light fitted to show the defendant's claims of right, as I view the questions. Ever since 1950, the defendant-appellant had a limestone quarry operation on land located on a part of a ranch now owned by the plaintiffs-appellees; appellees acquired the ranch in 1973. Between 1950 and 1960, the operation was carried on under an oral agreement between the defendant and predecessors in title by the name of Cole.

In 1960, the defendant decided to move its quarry to a different location. At that time the oral understanding was incorporated into a written limestone lease,[1] which included other land with which we are not concerned, with subsequent owners by the name of Cooper, the royalty to be split between the Coles and the Coopers for a period of 50 years. The Coles had been leasing what is known as the Oppenheimer place, a 160-acre tract immediately south and east of the quarry lands. The Oppenheimer lease was part of the total ranch unit owned by the Coles and sold to the Coopers, but the lease was retained in the Cole name as security. In 1967 Lloyd Cole arranged for the Coopers to purchase the Oppenheimer place, the Oppenheimers reserving a one-half interest in the limestone from the Oppenheimer place. The Coopers in 1971 sold the entire ranch, including the Oppenheimer place, to a Clayton H. Talley, who later died. On July 11, 1972, a contract for deed was executed between the plaintiffs and the surviving widow of Talley, also the personal representative of his estate.

When defendant moved to its new quarry operation in 1960, Cole and C. D. Roberts, one of the officers of the defendant corporation, orally agreed upon the Oppenheimer place for stockpiling limestone mined from the quarry. The reason for stockpiling on the Oppenheimer land was that part of the limestone leased land to the west, where defendant could have stockpiled, was a better piece of ground, capable of cultivation; it was preferable to use the Oppenheimer land in that it was a rocky ridge and less apt to contaminate the limestone product to be quarried. The area occupied on the Oppenheimer ground amounts to 16.13 acres. Though the Oppenheimer property was then owned by Oppenheimer, it was part of the Cole ranch operation under a lease and Cooper then occupied the land and paid the rental on the lease, until he bought it in 1967. The stockpiling was done on the Oppenheimer ground with full knowledge, consent

1. The Agreement for Lease of Limestone Rock Deposits and Grant of Right to Maintain Quarry, in its pertinent provisions, is as follows:

"WITNESSETH: That the parties of the first part for and in consideration of the covenants and agreements hereinafter mentioned to be kept and performed by the said party of the second part, its assigns and successors in interest, do hereby lease upon a royalty basis all of the limestone rock in place upon the following described premises, to-wit:

\* \* \* \* \*

"upon a royalty basis. The second party shall have the right to mine such quantities at such times as it may desire, all of said limestone rock needed by it in its operations and as royalty therefor second party agrees to pay four cents per ton of two thousand pounds. Two cents of this royalty shall be paid to first parties and the remaining two cents shall be paid direct to Lloyd H. Cole and Blanche L. Cole, predecessors in title of first parties.

"Second party shall keep and maintain suitable scales and first parties shall have the right to inspect the same at any time they desire and second party agrees to make settlement for the limestone rock as mined in ninety day intervals. The second party shall also have the right to maintain on said premises stock piles at all times and such stock piles shall not be paid for until such time as they are moved and weighed.

"Second party has now situated on said premises a rock crusher plant and maintains a rock quarry thereon under an agreement and understanding with Lloyd H. Cole and Blanche L. Cole, predecessors in title of first parties, and it is agreed that it shall have the right to maintain such plant and quarry at all times during the life of this lease and shall have the right of ingress and egress at all times in order to properly mine and remove said rock.

"Second party agrees to pay first parties for loss of any livestock or other property damaged or injured in its blasting.

"The term of this lease shall be for fifty years from date and shall end and terminate on July 25, 2010. During this time second party shall have the exclusive right to maintain his plants and rock quarry thereon for the purpose of mining and removing said limestone rock and this grant shall be an exclusive grant of all the limestone rock contained in these premises but second party shall at all times conduct its operations so as to interfere as little as possible with first parties' ranching business."

and approval of both Cole and Cooper and actually at Cole's request. The exact understanding between Cole and the defendant is reflected in the testimony of Cole in response to a question inquiring what was said about the Oppenheimer land:

"A [By Mr. Cole] I explained to Mr. Roberts that I didn't—that I didn't own the Oppenheimer land, that I had a lease on it, and that I had the first right to buy and that I owned the land to the west where they could stockpile, but due to the fact that it was a better piece of ground and a little cultivated field there that would be covered by the stockpiles it would be preferable if we could use the Oppenheimer land to stockpile on, and he agreed that it would be handier because it was a better base to pile it on, because it was a rocky ridge and it would be far less apt to contaminate their product with mud and whatnot than it would to the west, and he was perfectly agreeable, and I said in the event my deal should fall through with the Oppenheimers and they—and I not acquire it that it might be necessary sometime in the future to move the stockpiles back to the west and continue the operations over there, which could be done on the deeded property."

C. D. Roberts, president of the defendant corporation, testified to his version of the transaction as follows:

"A 1960, yes, and I might just state a little thing about that, when we quit the pit up here, I was on a deal with Mr. Alfred Mauch and Janes east of town to open up a pit. Lloyd Cole was still the owner here, and I said, 'Lloyd, I think I'm going to go east of town.' He said, 'No, you're not.' He said, 'I've got a location right up here.' He said, 'I still want you. I want that royalty out of that rock.' 'Well,' I said, 'I thought I would get east of town and it might be better.' He said, 'No,' he said, 'Let's go up and look,' so we got hold of Alan and Lloyd and myself, and one evening we drove up there and he said, 'Here's where I'd like you to open up your pit,' and I said, 'Well, it doesn't look bad.' He said, 'I don't own the ground to the south where I want you to stock pile, but I have a lease and I have the first option to buy it.' He said, 'If you would stock pile on this—where I want you to set your crusher, why, you would stock pile down here in this oat field.' He said, 'Where I want you to stock pile here I have tried to plow that ground two different times,' and he said, 'It is so rocky we can't get a plow in the ground,' so he said, 'It isn't good for anything else but stock piling.' I said, 'Lloyd, I don't care where you want us to stock pile, whether it is on the lease or whether it is on the place that you don't own but rent it and have first option to buy it, it is immaterial to us,' and that's where we've been ever since 1960."

The plaintiffs were likewise fully aware of the whole quarry operation, including the stockpiling, and in their contract for deed under date of July 11, 1972, the following provision was contained:

"* * * Seller further notifies the buyers that a portion of the mineral rights in this property have [sic] previously been separated from the surface of the property and further advises that there is a long term contract covering certain rock and gravel deposits. The Buyers herein hereby acknowledge that they are familiar with the Contract, commonly referred to as the Roberts Contract, which grants to the Lessee the right to mine certain rock and gravel from the property under certain royalty agreements. The Seller does not reserve any mineral rights whatsoever, but specifically *advises the Buyers herein that they must purchase subject to the prior reservations of minerals and the <u>contracts in</u> regard to said minerals which are now in effect.*" (Emphasis supplied.)

In addition to the stockpile on the 16.13 acres, the major subject matter of this dispute, there is located a secondary rock

crusher, explosive storage and what is termed junk. From time to time contractors have set up mix plants on the ground for easy access to rock and to save handling of the material. This additional activity was never objected to by any of the plaintiffs' predecessors in title and enhanced the value of their royalty interests by attracting increased production. The plaintiffs viewed the land on several occasions prior to acquisition and were aware or should have been aware of the presence and location of the additional activity.

The majority pivots its position on the ground that " 'a mere tenant cannot grant a license to a stranger.' " There is no argument that when the defendant first went on the Oppenheimer land he took the license subject to the lease. The Oppenheimer land, however, was transferred to the Coopers in early 1967 and from that time, any contingency because of the lease expired. (Not only that but on March 18, 1971, the Coopers conveyed one-half of the limestone under the Oppenheimer land to the Coles.) The use by the defendant went along uninterrupted until the plaintiffs initiated this action. There was never any known objection by the lessor, Oppenheimer. If the lease had continued, the majority would have a point but it became a complete nullity and leaves the majority standing on a no longer viable, empty tech-

nicality, as the basis of its conclusion. These material facts are not in anywise disputed.

A few days before trial, the defendant corporation acquired the mineral rights under the ground occupied by the stockpile from the Coles. This took place, however, after the trial judge had entered a summary judgment in the case in favor of the Coles,[2] not on this appeal but parties defendant at the trial level.

It is disturbing to my sense of justice that the defendant should be penalized for the use of the 16.13 acres of land when its utilization has been first under a color of authority given by the lessee of the Oppenheimer place, Mr. Cole. There is no proof in the record that under the lease terms with Oppenheimer he lacked any right to grant such permission to the defendant. Then, in early 1967, Cole's successor in title, Cooper, having acquired the Oppenheimer land, permitted, and as a matter of fact approved and encouraged the limestone being stockpiled on the property, until he sold the ranch to Talley. Talley acquired the ranch subject to the quarrying operation and during his short period of possession under a contract for deed, he likewise permitted the use to continue. The stockpiling has an indirect benefit to those persons who owned the mineral royalty interests, first Cole, then Cooper, then Talley,

---

2. "IT IS, THEREFORE, ORDERED, ADJUDGED AND DECREED, THAT:
 "(1) Defendants Lloyd H. Cole and Blanche L. Cole are the owners of a fully participating, undivided one-half mineral interest in and to all of the limestone in and under and that may be produced from the NE¼SW¼, NW¼SE¼, E½SE¼ of Section 11 in Township 51 North, Range 63 West of the 6th P.M., Crook County, Wyoming, and that the Defendants Lloyd H. Cole and Blanche L. have (a) the right of ingress and egress to mine the above-described premises and the right to explore for, develop, and produce their share of the limestone without the consent of the Plaintiffs and (b) the right to execute a lease upon their interests without the consent of the Plaintiffs.
 "(2) Defendants Lloyd H. Cole and Blanche L. Cole are the owners of a fully participat-

ing undivided one-half mineral interest in and to all of the limestone, oil, gas, and other minerals in, on, and under the lands described in Exhibit 'A', together with the right of ingress and egress to remove the same and are also the owners of one-half of all limestone royalties that may be paid for limestone removed from the above-described premises, and that the Defendants Lloyd H. Cole and Blanche L. Cole have (a) the right of ingress and egress to mine the above-described premises and the right to explore for, develop, and produce their share of the limestone without the consent of the Plaintiffs and (b) the right to execute a lease upon their interest without the consent of the Plaintiffs."
Exhibit "A" attached to the summary judgment includes the 16.13 acres of so-called Oppenheimer land, upon which the defendant has its stockpile.

and, finally, the plaintiffs, now the owners of royalty benefits under the contract with the defendant. An additional benefit to plaintiffs has been that lands capable of cultivation have been made available rather than the rocky ground occupied by the stockpile, which from the aerial photos in evidence appears incapable of nourishing even a lone prairie dog runt.

To have the permission which the defendant had uprooted by a sudden order to forthwith move tons and tons of limestone, placed in an area upon reliance of the permission granted and continued, reeks with inequity. The defendant did have an express right accruing from all of the owners of the land except the plaintiffs.

The defendant has a right to rely upon the license given openly and aboveboard by the beneficiaries of the royalty arrangement. Plaintiffs should not be permitted to abruptly disturb that arrangement to the detriment of the defendant. The judgment of the trial court is unnecessarily harsh. The land would be restored to plaintiffs for no good reason at their whimsical demand. It would be my holding that the defendant has a license to occupy the property even though it has no interest in the real estate. Its right is not by the grant of any easement, implied or express, nor by prescription.

A license may be expressly created by parol as well as in writing or may be implied from the acts of the parties, from their relations and from usage and custom and if the owner of land, with full knowledge of the facts, tacitly permits another repeatedly to do acts upon the land, a license to do such acts may be implied from owner's failure to object. *Kendrick v. Healy*, 1920, 27 Wyo. 123, 148, 192 P. 601, 610. The consent of the licensor, which is essential to a license, may be manifested by conduct of any kind which is indicative of the licensor's consent to the use of his land by another. *Chicago and North Western Railway Company v. Rissler*, D.C.Wyo. 1960, 184 F.Supp. 98, 101.

1A Thompson on Real Property, 1964 Replacement, § 225, p. 235, states as follows:

"In the case of licenses as in other instances in the property law, equity sometimes raises its horrid head to fatally sting the logic of the law. A license is not a property right. It may, therefore, be created by parol, and it may, therefore, be revoked. But what to do if the circumstances would make it inequitable to permit revocation? The doctrine of irrevocability of licenses is a classic example of how the courts, on similar states of facts, reach the same results through different approach theories. But even in the formative stages the English law recognized the injustice in certain instances of licenses being revocable at the whim of the licensor. So early it was admitted that licenses acted upon became irrevocable. Finding itself in this dilemma the law has escaped by finding irrevocable licenses particularly where the Statute of Fraud prohibits an easement. This device of an irrevocable, revocable easement is explained under two types of circumstances; licenses coupled with a grant or an interest, and licenses acted upon. In both instances the underlying policy is in the nature of an estoppel."

We find Wyoming cases taking this equitable bent, so well expressed in Thompson.

A "license" is a bare authority to do a certain act or series of acts upon another's land, without possessing an estate therein. *Metcalf v. Hart*, 1891, 3 Wyo. 513, 531, 27 P. 900, 906, 31 Am.St.Rep. 122, 138, aff. 31 P. 407. The court there explains at great length how both law and equity have recognized that a license can become irrevocable even though based upon parol and such a result is rooted in equity, in order to accomplish what justice and good conscience demand. As said in one of the cases cited with approval in Metcalf, "A right under a license, when not specially restricted, is commensurate with the thing

of which the license is an accessory." (3 Wyo. at 543, 27 P. at 911, 31 Am.St.Rep. at 151.) Each case must stand on its own circumstances. The case recognizes the concept that a party who has induced the combination of the property of another with his own through a promise, express or implied, to not interfere with its use or enjoyment should not be allowed its return although he may withdraw the right to use it when it has served the purpose contemplated.

I recognize that neither Cole nor Cooper wished to withdraw from the license granted and honored it. Metcalf recognizes that a party in possession is notice to a subsequent purchaser and if he is decreed the return of the land, he must place the licensee in status quo and do equity by bearing the cost of the displacement from the position in which he has been placed. That is one solution but I would not take that lesser course.

The equitable principles inuring to the benefit of a licensee where he has in good faith expended money and labor on the strength of the license of an owner are carried forward in *Coumas v. Transcontinental Garage*, 1951, 68 Wyo. 99, 230 P.2d 748, 41 A.L.R.2d 539. That is a case in which the defendant gave parol permission to the plaintiffs to anchor their building into a wall of the defendants' building to form a partition between the two buildings. Plaintiffs claimed a perpetual easement; defendants claimed it to be a limited license. The court held that plaintiffs acquired no easement or interest in the land and improvements but only a license for structural purposes during the life of the building.

*Coumas* stands for the proposition that the term of a license depends upon the circumstances in each case, when it was said (68 Wyo. 99, 127, 230 P.2d 748, 758, 41 A.L.R.2d 539, 552):

"* * * A more universal rule is, we think, that a privilege to do certain acts of a temporary character on the land of another is and always remains a mere license which is revocable at the will of a licensor unless a definite time has been specified, or unless it is coupled with an interest. * * *"

After considerable discussion in *Coumas* about how much money and labor must be expended to make a license irrevocable, the court ended up with the conclusion that the criterion as to whether a license should be revoked is whether or not, considering all the facts and circumstances, it would be unjust and equivalent to a fraud to permit the revocation.

We could do as the court did in *Coumas* and take judicial notice of the fact that it cost money to place the various sized crushed rock into piles by size, running from 100 tons to 20,000 tons, on the 16.13 acres. Aerial photos show extensive piling. It would cost money to move the stockpiles. It would cost money to strip another suitable area and prepare it for stockpiling as well as expense of readjusting the operation to a new plan. *Coumas* considers not only the expense connected with executing the license by the licensee but also the expense involved if he were ejected. I am convinced that *Coumas* has material application with respect to money expenditures involved not only in the inception of the license but in the cost of stockpiling and the burden of relocating. Justice Blume recognized that the initial expenditure was not much. In *Coumas*, 68 Wyo. 99, 230 P.2d 748, beginning at page 133 of the Wyoming Reports, it is made clear on the point that the licensee probably saved money by not having to build a wall. Justice Blume recognized that there is no general rule as to the amount of expenditures required, page 134 of the Wyoming Reports. We must not overlook the cost of piling the rock and reestablishing a new storage area which would entail the cost of preparing the tillable land and moving the stockpiled rock from the 16.13 acre area to a new area. This is similar to the situation in *Coumas* where there would be considerable cost involved in constructing a new wall. The significant point is the detriment that will be incur-

red in rearranging the operation. See page 136 of *Coumas*[3] in the Wyoming Reports.

I conclude that the equitable circumstances point to the grant of a license for a period equal to that of the limestone lease. I would hold that at the end of the remaining 35 years of the existing 50-year lease, the license will expire, unless sooner by some act of abandonment or agreement of the parties, it is no longer used.

I would not allow punitive damages related to the gate for at least two reasons: (1) the defendant had a right as a matter of contract and law to free access in and out of the quarry; and (2) the plaintiffs provoked the Robertses into the action they took in tearing down the gate.

I do not believe that the trial court had any right to award damages for removal of the gate, accepting the view of the majority that requiring the defendant to replace the gate or build an auto gate is the same as a judgment for damages.

In the first place, the limestone agreement to which plaintiffs' ownership was subject, specifically provided that the defendant "shall have the right of ingress and egress at all times in order to properly mine and remove said rock."

In my examination of the law pertaining to gates, it is observed that presence of unnecessary gates is a frequent source of bitterness, with ensuing litigation, and seems to arouse the worst in people, as is the case here. I am able to understand the annoyance of an impediment to carrying on an active, moving business. The plaintiffs erected a gate on a point on a road where there never before had been one.

Examining the facts in this case, we find undisputed testimony not requiring the resolution of any conflict of evidence by the trial court that ever since the establishment of a quarry on these and other nearby lands, there has never been any problem by any of the owners with respect to escaping cattle nor was there any problem by any tenant, all of whom testified in the case. It was also clear that cattleguards installed had been an adequate protection to livestock. It is also undisputed that because of the nature of the defendant's business, particularly during the highway construction season, there was heavy traffic in and out of the quarry and it would be an imposition upon the truck drivers of contractors buying stone, fighting time and deadlines, to dismount from their trucks in order to enter the quarry to pick up a load, to open a gate, get back in the truck, go through the gate, stop the truck, dismount to close the gate and do the same thing after having picked up a load in order to depart. The proprietors of the quarry were in and out frequently at all times for the purpose of not only operating the stone crushers and associated equipment but in between times for maintenance purposes. The importance of the road to this industry is further demonstrated by the active part taken by the defendant in its maintenance by graveling, blading and snow removal.

3. Some interesting cases acknowledging the theme of irrevocability of a license for equitable reasons can be found in other cases though I rely upon Wyoming jurisprudence. See the following: *McCollum v. Hicks*, Ky.1953, 262 S.W.2d 816; *Keystone Copper Mining Co. v. Miller*, 1945, 63 Ariz. 544, 164 P.2d 603; *Waters v. Baker*, 1940, 190 Ga. 186, 8 S.E.2d 637; *Fitzsimmons v. Gilmore*, 1938, 134 Neb. 200, 278 N.W. 262; *Holt v. City of Montgomery*, 1924, 212 Ala. 235, 102 So. 49; *Albrecht v. Drake Lumber Co.*, 1914, 67 Fla. 310, 65 So. 98; *Harris v. Brown*, 1903, 202 Pa. 16, 51 A. 586, 90 Am.St.Rep. 610; *Appeal of Clelland*, 1890, 133 Pa. 189, 19 A. 352, 7 L.R.A. 752. See also Annotation, 74 A.L.R.2d 886, "Duration of license in or on real property granted for a specific purpose where no period has been specified." A panoramic view of real property licenses can be found in 25 Am.Jur.2d (Easements and Licenses, Part II, Licenses in Real Property), §§ 123 through 136, and 53 C.J.S., (Licenses II In Respect of Real Property), §§ 79 through 96. There are no two cases alike and, as observed by Justice Blume in *Coumas*, the circumstances of each case must govern. His review of the subject cannot be improved upon.

The plaintiffs, without any notice or explanation to the defendant or any of its employees, erected the gate. It is true that some cattleguards in place had not been cleaned out with the result that dirt and other material had piled up to the point where the rails were ineffective to prevent the passage of livestock but when the gate was erected, there were no animals on the ranch nor had there been for some time. It would have been reasonable for plaintiffs to advise defendant of the plan to bring in livestock and request that the cattleguards be cleaned. The plaintiffs were unreasonable in the fashion in which they went about erecting the gate and persistently closing it when it had been left open.

A comprehensive annotation appears in 52 A.L.R.3d 9, entitled "Right to Maintain Gate or Fence Across Right of Way." There, at pages 19 and 20, appears the following:

"Despite the existence of a number of general rules, the lawfulness of a gate or fence across a right of way remains a question of fact, the courts looking at various factors and balancing the right of the servient owner to use his land, with the right of the right-of-way owner to use his right of way. That the lawfulness of a gate or fence is a question of fact is consistent with the more general proposition that what may be considered a proper use by the owner of land subject to an easement, generally, is a question of fact."

In *National Cylinder Gas Co. v. G. H. Packwood Manufacturing Co.,* Mo.App.1948, 208 S.W.2d 825, it was held that the servient estate owner had to remove a chain hung from posts at the entrance into its property, where the land in question was industrial property, and where the terms of the grant had specified that the easement was to be used by trucks. (While in our instant case the grant does not specify that the easement was to be used by trucks, the nature of quarry activity required the use of trucks and must have been known at the

time of its execution.) The court stated that while the chain was only hooked on posts and could be unhooked to permit the passage of trucks, the easement was specifically for trucks and was on industrial property. Therefore, the court reasoned, the easement was not similar to the usual easement designed to allow ingress and egress over another's lands to and from residential farm property, since it appeared that not only the trucks of the easement owner but also the trucks of other companies used the right of way, and that to compel the drivers of these vehicles to lower the chain and to replace it upon their departure seemed an unreasonable hindrance to the use of the right of way.

In *Jordan v. Guinn,* 1972, 253 Ark. 315, 485 S.W.2d 715, 52 A.L.R.3d 1, the court held unlawful a gate that had been maintained across one end of a right of way, it being stated in reference thereto that unless it expressly stipulated or it appears from the terms of the grant or the surrounding circumstances that the way should be an open one, without gates, the owner of the servient estate may erect a gate across the way if they are so located, constructed or maintained as not to unreasonably interfere with the right of passage, when they are necessary for the preservation and proper and efficient use of the servient estate. It was said by the court that what is reasonable or unreasonable depends upon the facts and circumstances of the particular case and reasonable minds might differ on the subject. In other words, the court stated that the lawfulness of the gate is a question of fact. The court pointed out the pertinent factors to be considered include the terms of the grant, the intention of the parties as reflected by the circumstances, the nature and situation of the property, the manner in which it has been used and occupied before and after the grant and the location of the gates. It was also pointed out that the relative importance of the language of the grant and the circumstances of the case varies from case to case, depending upon the completeness and the clarity of the language used. The less complete or unclear the lan-

guage, the court explained, the more important the circumstances become.

The foregoing observations of the Arkansas court are particularly applicable in the situation here in that there was no full and complete explanation in the grant of the manner of ingress and egress and there was no provision as to what facilities would be provided for the passage, but it can be gleaned from the circumstances here that cattleguards were historically the means of passage in and out of the land, suitable for the purpose to be served and did afford the protection to a landowner engaged in the agricultural business. I would take judicial notice of the fact that within the State of Wyoming, the accepted method of frequent passageway over a fence line is by a cattleguard. The facts indicate that to properly remove the rock, as the contract reads, it is necessary that there be free and open access.

There is a line of cases which hold that the servient owner cannot lawfully maintain a gate across a right of way acquired by grant, where the grant had not specified the condition of the way and where it is emphasized that there has been no legitimate purpose for the maintenance of a gate. I would approve of that rule as applicable here. *Jordan v. Guinn,* Ark.1972, supra; *Sprogis v. Silleck,* 1961, Sup., 223 N.Y.S. 2d 979; *Schaefer v. Burnstine,* 1958, 13 Ill. 2d 464, 150 N.E.2d 113; *Simon Distributing Corp. v. Bay Ride Civic Association,* 1955, 207 Md. 472, 114 A.2d 829; *Reider v. Orme,* 1933, 17 Tenn.App. 497, 68 S.W.2d 960; and *Jewell v. Clement,* 1897, 69 N.H. 133, 39 A. 582.

It seems to have been consistently held that the servient estate owner cannot lawfully maintain a gate across a right of way acquired by grant, where the grant did not specify the sort or condition of the way and where the fact existed that a gate was absent at the time of the grant and has continued over a period of time. I likewise would approve of that applicable rule. *Reddick v. Williams,* 1971, 260 Md. 678, 273 A.2d 153; *Sprogis v. Silleck,* 1961, su-

pra; *McDonnell v. Sheets,* 1944, 234 Iowa 1148, 15 N.W.2d 252, 156 A.L.R. 1043; *Kinkade v. Lyons,* 1930, 235 Ky. 226, 30 S.W.2d 963; 73 A.L.R. 775; *Raisor v. Lyons,* 1916, 172 Ky. 314, 189 S.W. 234; *Oak Grove Missionary Baptist Church v. Rice,* 1915, 162 Ky. 525, 172 S.W. 927; *Dickinson v. Whiting,* 1886, 141 Mass. 414, 6 N.E. 92; and *Welch v. Wilcox,* 1869, 101 Mass. 162, 100 Am.Dec. 113.

I would conclude that the gate erected by plaintiff was contrary to the contract terms, unlawful, unnecessary, did not exist at the time nor for a long period following the grant and was an unreasonable interference with the defendant's access to and from his quarry, not only for himself but for the many contractors purchasing its rock.

Since defendant, through its officers and employees, had the lawful right to access to and from their quarry without it being blocked by a gate, it follows that it had a right to remove the gate. It is unfair and inequitable for defendant to be assessed punitive damages for removal of the gate, when, as a matter of law, it was entitled to an unimpeded right of way in and out of the quarry for both its employees and customers for the rock product. Additionally, it would be inconsistent to reward plaintiffs for commission of an unlawful act.

I would further add that there is absolutely no conflict of testimony with respect to the historical free access in and out of the quarry area. Vondriskas' point of view as to the necessity of the gate is only their current opinion, bearing no relationship to the past established use and is furthermore in complete conflict with the terms of the contract. I do not therefore think that I am substituting my opinion for that of the trial court. Nor do I believe that I am usurping the factfinding function of the trial court because there was no conflict to be resolved.

It has been suggested that the lawfulness of the gate is not an issue on this appeal. Though the defendant did appeal from that

portion of the judgment, it did not argue the point with respect to actual damages because as a practical solution, it recognized the facts of life and installed a cattleguard at the point where the unlawful gate was located in order to carry on its business rather than install a gate. It has never acceded, however, to the construction of a gate or to any assessment of punitive damages. A gate and a cattleguard are two entirely different means of passage. A gate interferes with defendant's quarrying business; a cattleguard does not. It has appealed and argued the punitive damages award and the unlawfulness of the gate is directed to that part of the judgment, not the grant of actual damages, if that be the case. The defendant has never in any fashion acknowledged or conceded plaintiffs' right to erect a gate. It probably cares not how many cattleguards plaintiffs want to install, or where.

When there is a reasonable excuse for the conduct of the defendant arising from the provocation or fault of the plaintiffs but not sufficient entirely to justify the act done, punitive damages should not be allowed. *Giffin v. Petree*, 1932, 226 Mo. App. 718, 46 S.W.2d 609, 614. The defendant's officers were goaded into their conduct by plaintiffs. While a civil assault case, we find this same principle expressed in *Condict v. Hewitt*, Wyo.1962, 369 P.2d 278, 280, holding exemplary damages not recoverable when there is provocation by the plaintiff.

The behavior of the plaintiffs was strange, to say the least, and all combined to create a most aggravating situation for the defendant and its officers. The testimony, as disclosed from the transcript, indicates that at the time the contract for the sale of the ranch to the plaintiffs was made, there was a manifestation that the plaintiffs were displeased about the quarry operation and they intended to do something about it and seek to cancel or change the contract. This is borne out by their conduct thereafter. The plaintiffs served notice on the defendant of their demand that the whole quarrying agreement be changed to increase the royalty, provide for cash payments in addition, together with a number of other restrictions and conditions.[4] The defendants flatly refused to consider any change in the existing agreement. The trial court very properly held the contract valid.

One of the plaintiffs, Dr. Vondriska, walked and rode his motorcycle around the ranch with a .38 pistol strapped to his hip, which he claimed he was carrying for the purpose of shooting skunks. The plaintiffs accused the defendant operators of setting fire to their house and burning it down, though there was no evidence to support this proposition. (This took place shortly before trial but is illustrative of plaintiffs' offensive conduct.) The defendant was accused of making short tonnage reports, which was never proven. In addition, plaintiff published various

4. Compare the terms demanded by plaintiffs with the agreement appearing in footnote 1. Following are plaintiffs' ultimatums:
 "Agreement for lease of Quarry and operation of said Quarry.
 "1. Yearly lease payment due April 1st of $4500.00.
 "2. Nine cents a ton of said rock. Monthly or 60 day payment schedule.
 "3. One thousand dollar security bond against tonnage violations.
 "4. Three hundred dollar fine for tonnage violations from September 1972–February 1973.
 "5. Roberts Construction will either accomplish or delegate the jobs of cleaning cattle guards, replacing any fenc-

 ing that has been destroyed or damaged by carriers of material from their quarry and loss of livestock, etc. from carriers.
 "6. Lease of 3–4 years with first option on renewal.
 "7. Co-operation in planning quarry enlargement and expansion.
 "8. Possibilities of dust retardant on haul road approximately one mile. For major jobs that originate from Roberts quarry closing of haul road at end of day at exit on Highway 14 at descretion [sic] of land owner.
 "9. Repair on Canyon Road and minimal maintanance. [sic]"

fatuous notices in the local newspaper, directed to the defendant and its officers, one of which read: "NHF Ranch, Rumor Control No. 283–2727," run for about two months. The plaintiffs had named their ranch the No Hard Feelings Ranch. The purpose of the ad, testified to by plaintiff Dr. Vondriska, a dentist, as he related it: he had been hearing rumors in town about the things that were being asked and things that were being done and things that they were doing and things that they weren't doing and if someone really wanted to find out if they were doing something or asking for something that they could call that number and they would tell them the truth on something. On another occasion, the following ad was run: "Card of Thanks. We want to thank those individuals who generously gave of their time and labor on the Sabbath to enlarge our fence post holes and straighten our gates. We certainly feel obligatory in reciprocity. NHF Ranch." This last advertisement, of course, had reference to the circumstances surrounding the gate incident and was after the fact but again shows a meanness of feeling toward defendant's officers consistent with his conduct in erecting the gate. In general, the plaintiffs Vondriskas were most disagreeable toward defendant's officers from the time they acquired the ranch.

In the spring of 1973, plaintiffs put up the new metal gate attached to a post, which gate went across what is known as the canyon road, one of the two roads used for ingress and egress to the defendant's limestone operation. The defendant was most dissatisfied about this; company personnel left the gate open every time they went through it and one of the plaintiffs testified that he closed the gate some "40, 50 or 60 times" before it was inactivated by the Robertses as will be explained.

The defendant Roberts Construction Company is operated by a father and son, C. D. Roberts and Alan Roberts. They were angry about what they referred to as "playing close the gate" and on a Sunday in July, 1973, when going to the quarry operation for weekend maintenance purposes, threw a cable over the fencepost of the gate and with one of their pickups yanked it down. It was bent and the fencepost broken as a result. Cattleguards had been the usual means of access over fence lines and there were several on the canyon road. However, during the trucking operations in and out of the quarry, the cattleguards would fill up with dirt and other material and cattle and horses could go through without any trouble, if there had been cattle or horses on the ranch.

Both Cole and Cooper as well as a former tenant testified that over the long period of years the quarry operations had been in effect, they had never had any problems with the defendant over access nor had there ever been any problem with regard to cattle getting in and out of the ranch. According to the plaintiffs, the purpose of the gate was to control cows and horses on the ranch.

It is obvious from the evidence that the plaintiffs intended to and did make life miserable for the Robertses as well as interfere with the quarry operation. In addition to erecting the gate, on another occasion, they erected a snow fence across one of the cattleguards. At another time, Mrs. Vondriska parked her pickup across the road and hurried to close the gate to prevent one of the Robertses just approaching, from passage, without having to open the gate. Mrs. Vondriska accused him of making obscene remarks and gestures. The erection of the gate was the straw that broke the camel's back.

I would hold that while the conduct of the Robertses, in tearing down the gate, was not nice, they certainly were provoked by plaintiffs into doing it. Under such circumstances, I would deny punitive damages.

Another problem in that connection is that the $500.00 punitive damages were awarded for both destruction of the gate

and blasting without notice. No notice of blasting was necessary because Mrs. Vondriska was at her home watching the activity of preparation to blast out a rock in the road—a perfectly legitimate purpose—and reported that fact to her attorney while the preparations were underway. Blasting is a common occurrence around a quarry. There was a complete absence of any proof of standards to be followed in blasting activity. No actual damage was proven as well. If there are not actual damages, there can be no punitive damages. *Martel v. Hall Oil Co.*, 1927, 36 Wyo. 166, 186, 253 P. 862, 867, 52 A.L.R. 91, 101, reh. den. 255 P. 3. How should that be broken down? The majority offers no answer but completely ignores the matter.

I would have allowed plaintiffs no recovery and reversed the entire judgment of the district court and remanded with directions to vacate its judgment and enter judgment for the defendant on all counts, however, restricting the license to 16.13 acres in that plaintiffs have withdrawn any license as to the remaining portion of the Oppenheimer lands.

THOMAS, Justice (concurring in part and dissenting in part).

My analysis and research in this case has led me to a point that causes me to dissent from some of the views of the majority, and at the same time prevents me from joining in the dissent of Justice Raper. I concede that my sense of justice also is affronted by a determination resulting in the removal of this stockpile of crushed rock from a relatively unproductive tract of land to a tillable and productive tract of land at some considerable expense to Roberts, solely to satisfy the whim of the plaintiffs. The questionable desirability of this result is compounded by the knowledge imparted by the record that Roberts now has an adjudicated right to mine the very premises it is required to vacate. Should Roberts pursue its right to mine, which will be more feasible with the stockpile removed, those mining operations well may leave the plaintiffs in a worse situation. Nevertheless, I cannot arrive at the total irrevocability of this license as Justice Raper has done. The record simply does not demonstrate circumstances that permit me to substitute my judgment for that of the trial court and hold the license entirely irrevocable under the applicable precedents. I cannot, however, join in the majority opinion on this issue. I find a solution to my dilemma in my conclusion that Roberts was possessed of a license coupled with an interest. 5 Restatement of the Law of Property, § 513, p. 3121 (1944). This concept is not new to the law of Wyoming, and is recognized in *Coumas v. Transcontinental Garage, Inc.*, 68 Wyo. 99, 230 P.2d 748 (1951), and *Metcalf v. Hart*, 3 Wyo. 513, 27 P. 900 (1891).

While all the facts and circumstances do not permit me to depart from an apparent conclusion of the trial court that all the activities of Roberts were not within the scope of the license to it (an apparent acquiescence found in the record must be resolved by the trial court) there was a license to stockpile the crushed product of the quarry on the lands in issue. The existence of such a license is recognized by the majority, and the trial court recognized Roberts' ownership of the crushed rock in the stockpile, which is personal property. This ownership of the crushed rock leads to my conclusion that Roberts was possessed of a license coupled with an interest.

The interest upon which I rely would be limited at any given point in time to the crushed rock then in the stockpile. Any license to stockpile in the future I hold to be revocable, and in this instance it was revoked by the institution of the action. To the extent that the license is not revocable because it is a license coupled with an interest, I would limit the license to the disposition of the existing stockpile in the usual course of the business of Roberts. The terms of the creation of this license were that the crushed rock could be stockpiled on the premises and removed in the

usual course of Roberts' business. This is demonstrated by the historical application of the license, and to the extent that the license is necessary to effectuate the interest with which it is coupled it is not subject to termination contrary to the terms of its creation. 5 Restatement of the Law of Property, § 519, p. 3137 (1944). See also 1A Thompson on Real Property, § 225, p. 242 (1964 Replacement). The trial court would be called upon to receive additional evidence to determine what a reasonable time would be to remove the stockpile in the usual course of the Roberts' business as the sales of the crushed rock occurred, but I would not view this as imposing an undue administrative burden upon the trial court. In the alternative, I would permit the immediate removal of the stockpile upon the condition that the plaintiffs pay the expenses of removal.

I also must dissent from the views of the majority with respect to the propriety of awarding punitive damages to the plaintiffs. In addition to the reasons suggested by Justice Raper, my examination of the record discloses that the claim to punitive damages was not pleaded or asserted in any manner by the plaintiffs. Recognizing the potential applicability of Rule 15(b), W.R.C.P., this is an instance in which the evidence which was introduced was offered and received to support the basic issue of breach of contract. Roberts well may not have been conscious of any relevance to the issue of punitive damages, which was not raised by the pleadings, unless that fact was specifically brought to its attention. Under these circumstances the pleadings will not be deemed amended under the first portion of Rule 15(b), W.R.C.P. See 6 Wright and Miller, Federal Practice and Procedure, § 1493, p. 466 (1971), and authorities there cited.

With respect to the issues of the right to damages for violation of the Wyoming Air Quality Control Act and the right of the plaintiffs to recover their costs, I concur in the views expressed in the majority opinion.